626 So.2d 1128 (1993)
Rev. Robert POLK, et al.
v.
Edwin W. EDWARDS, et al.
H. Eustis REILY, et al.
v.
Edwin W. EDWARDS, Richard P. Ieyoub and The State of Louisiana.
No. 93-CA-0362.
Supreme Court of Louisiana.
August 20, 1993.
*1130 Douglas M. Schmidt, Peter R. Borstelo, for Polk.
Jack M. Alltmont, Julie A. Scheib, Michael A. Berenson, for Reily.
Richard Ieyoub, Atty. Gen., Melinda M. Tucker, E. Barton Conradi, Leon Gary, Jr., James M. Field, Davis B. Allgood, for Edwards.
Peter Butler, amicus curiae.
CALOGERO, Chief Justice.[*]
The Louisiana Legislature passed four statutes authorizing the licensing of gaming operations:
1) The Louisiana Economic Development & Gaming Corp. Act ("The Casino Act"), 1992 Acts 384, La.Rev.Stat.Ann. §§ 4:601-686 and La.Rev.Stat.Ann. § 14:90(E) (West Supp.1993);
2) The Cruiseship Gaming Act, 1991 Acts 289, La.Rev.Stat.Ann. § 14:90(B) (West Supp.1993);
3) The Louisiana Riverboat Economic Development and Gaming Control Act ("The Riverboat Gaming Act"), 1991 Acts 753, La. Rev.Stat.Ann. §§ 4:501-562 and La.Rev.Stat. Ann. § 14:90(D) (West Supp.1993), and;
4) The Video Draw Poker Devices Control Law ("The Video Poker Act"), 1991 Acts 1062, La.Rev.Stat.Ann. §§ 33:4862.1-4862.19 (West Supp.1993).
Plaintiffs H. Eustis Reily et al. filed suit in the Civil District Court for the Parish of Orleans seeking a declaratory judgment that the Casino Act was unconstitutional on various grounds. Subsequently, plaintiffs Rev. Robert Polk et al. filed their lawsuit in the 19th Judicial District Court for the Parish of East Baton Rouge seeking a declaratory judgment that the Casino Act, the Cruiseship Gaming Act, the Riverboat Gaming Act, and the Video Poker Act were unconstitutional. The Reily lawsuit was transferred to the 19th Judicial District Court Parish of East Baton Rouge and consolidated for trial with the Polk lawsuit.
On December 4, 1992, the trial judge heard arguments in both cases on joint motions for judgment on the pleadings. On January 11, 1993, the court signed a judgment in both proceedings holding that all four of the statutes were constitutional except for that portion of the Casino Act which provided that the employees of the casino corporation would not be subject to state civil service.[1] This provision was held to be unconstitutional. Nevertheless, the trial court concluded that this feature of the Casino Act which excepted the employees of the Casino Corporation from state civil service was severable, and the remainder of the Casino Act was thus constitutional and unaffected.
Defendants filed a suspensive appeal directly with this Court on that portion of the judgment which declared unconstitutional the provision regarding state civil service.[2] Plaintiffs took a devolutive appeal to the First Circuit Court of Appeal from that portion of the judgment declaring the remainder of the Casino Act and the other three statutes constitutional.
Originally this Court denied a motion by all parties that the appeals pending in the court of appeal be heard and decided simultaneously with the state's direct appeal in this Court. On that occasion, we desisted from consolidating the appeals pending in the court of appeal with the appeal in this Court. We determined that the appeals in the court of appeal should run their course, and that the appeal by the state lodged in this Court should be held pending a consolidated hearing, when and if the forthcoming court of appeal decision were to be brought before this court on writs.
*1131 Subsequently, it became evident that the disposition of this case in the court of appeal would likely take substantial additional time.[3] Because of the importance of the matter to the state, its citizens, and the litigants, and upon receipt of another motion that the appeal in this Court be set and the issues in the case then pending in the court of appeal treated with the appeal here, and responding to the desires of all parties in the litigation, we brought up to this Court the appeals pending in the court of appeal, consolidated those appeals with the appeal pending in this Court, and set the cases specially for oral argument. For cases of significant public interest in which this court has taken similar action to expedite the conclusion of important litigation see Hainkel v. Henry, 313 So.2d 577 (La.1975); Seegers v. Parker, 256 La. 1039, 241 So.2d 313 (1970); State ex rel. Le Blanc v. Democratic State Central Committee, 229 La. 556, 86 So.2d 192 (1956).
With minor variations, the plaintiffs in each of the consolidated lawsuits present nine distinct issues for this Court's review:
1. Plaintiffs contend that three of the four statutes violate La. Const. art. III, § 12(A)(10), in that the acts constitute local or special laws defining crimes. In connection with this argument, they also contend that La. Const. art. III, § 12(B) is offended by the indirect enactment of a local or special law by the partial repeal of a general law.
2. Plaintiffs also contend that three of the four statutes violate La. Const. art. III, § 12(A)(7) because the acts constitute local or special laws granting to a private corporation special or exclusive rights, privileges or immunities.
3. Plaintiffs assert that the four statutes violate the admonition contained in La. Const. art. XII, § 6(B) that "[g]ambling shall be defined by and suppressed by the legislature."
4. Plaintiffs contend that the Casino Act constitutes an unconstitutional delegation of legislative authority to the Executive Branch which is offensive to La. Const. art. II, § 1, a provision which divides state government into 3 separate branches; and to La. Const. art. II, § 2, which prohibits one branch from exercising the power granted to another; and to La. Const. art. IV, § 1 which lists the components of the executive branch.
5. Plaintiffs complain that the statutes constitute an unconstitutional delegation of legislative power under La. Const. art. XII, § 6(B), the provision which gives to the legislature alone the duty to define gambling.
6. Plaintiffs allege that the four statutes violate La. Const. art. VI, § 4 by abrogating taxing powers granted to the city of New Orleans under its home rule charter.
7. Plaintiffs contend that the four statutes violate La. Const. art. VI, § 17 by interfering with the authority of the city of New Orleans to regulate land use, zoning and historic preservation.
8. Plaintiffs charge that the Casino Act violates La. Const. art. VI, § 14(A) by increasing the financial burden on the city of New Orleans without appropriating funds to meet the burden or authorizing the city to raise additional revenue.
9. Plaintiffs also take the position that the district court was correct in finding unconstitutional the provision of the Casino Act which required that employees of the Casino Corporation be non-civil servants but that the district court was incorrect in finding this unconstitutional provision severable. They would have us declare the Casino statute fully unconstitutional because of the unconstitutional feature regarding civil service.
For the reasons which follow, we find the judgment of the district court correct in all particulars. All four statutes are constitutional with one exception. The provision requiring employees of the Casino Corporation to be outside of civil service is indeed unconstitutional, as the district court found. And, because that provision is severable, the remainder of the casino statute is unaffected.
*1132 An elementary principle of statutory construction in constitutional law holds that all statutory enactments are presumed to be constitutional. Interstate Oil Pipe Line Co. v. Guilbeau, 217 La. 160, 46 So.2d 113 (1950); State on behalf of J.A.V., 558 So.2d 214 (La. 1990). Unless the fundamental rights or privileges and immunities of a person are involved, a strong presumption exists that the legislature in adopting legislation has acted within its constitutional authority. Board of Directors of Louisiana Recovery Dist. v. All Taxpayers, Property Owners, etc., 529 So.2d 384 (La.1988). This presumption is especially forceful in the case of statutes enacted to promote a public purpose, such as statutes relating to public finance. Id. at 387; See United States v. Jacobs, 306 U.S. 363, 369-70, 59 S.Ct. 551, 555, 83 L.Ed. 763, 768, mot. den., 306 U.S. 620, 59 S.Ct. 640, 83 L.Ed. 1026 (1939) ("the presumption that an Act of Congress is valid applies with added force and weight to a levy of public revenue").
The Louisiana Legislature, elected by the state's citizenry, may enact any legislation that the state constitution does not explicitly prohibit. Thus, in order to hold legislation invalid under the constitution, it is necessary to rely on some particular constitutional provision that limits the power of the legislature. In re American Waste & Pollution Control Co., 588 So.2d 367 (La.1991); Louisiana Recovery District, 529 So.2d 384.
This structure is unlike the federal union of the states and the federal constitution whose provisions are grants of powers.[4] The powers of the United States Congress are specifically delineated in the United States Constitution. Conversely, the Louisiana Legislature, as with the legislatures of the other states of the Union, has all powers which have not been denied it by the state constitution. In re American Waste & Pollution Control Co., 588 So.2d 367 (La.1991); Swift v. State, 342 So.2d 191, 194 (La.1977). The legislature's powers are derived from the citizens of the state who freely elect their legislative representatives. Alternatively stated, the provisions of the Louisiana Constitution serve as limitations on the otherwise plenary power exercised by the legislature, which may enact any legislation not prohibited by the Constitution. State Bond Comm'n of the State of Louisiana v. All Taxpayers, Property Owners & Citizens, 525 So.2d 521 (La.1988). The party challenging the constitutionality of a statute bears the burden of proving clearly that the legislation is invalid or unconstitutional. Specifically, the party must rely upon a constitutional provision which restricts the power of the legislature to enact the particular legislation and must establish that the legislation is barred by such provision. In re American Waste, 588 So.2d at 373; State Bond Comm'n, 525 So.2d at 525. Any doubt as to the legislation's constitutionality must be resolved in favor of constitutionality. Louisiana Recovery District, 529 So.2d 384. Accordingly, in an attack upon a legislative act as falling within an exception to the legislature's otherwise plenary power, an opponent must establish more than that the constitutionality of the legislation is fairly debatable. The opponent must establish clearly and convincingly that the constitutional aim was to deny to the legislature the power to enact the legislation. Id. at 388.
With this introduction, we turn to the arguments presented by opponents of the four gaming statutes.
ARGUMENTS # 1 & 2Local or Special Laws
Plaintiffs assert that three of the gaming laws are unconstitutional as local or special laws contrary to La. Const. art. III, § 12. The Polk plaintiffs contend that the Casino Act, the Cruiseship Gaming Act, and the Riverboat Gaming Act violate La. Const. art. III, §§ 12(A)(10), 12(A)(7), and 12(B). The *1133 Reily plaintiffs make the same argument with respect to the Casino Act.
Louisiana Const. art. III, § 12 provides in pertinent part:
Except as otherwise provided in this constitution, the Legislature shall not pass a local or special law:
* * * * * *
(7) Creating private corporations ...; granting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity.
* * * * * *
(10) Defining any crime.
Louisiana Const. art. III, § 12(B) provides:
The legislature shall not indirectly enact special or local laws by the partial repeal or suspension of a general law.
In support of their argument that the Casino Act is a local or special law, plaintiffs assert that the legislature intended that it be a local or special law because the Casino Act was in fact introduced in accordance with La. Const. art. III, § 13, which requires publication of notice of the intent to introduce a local or special law. Defendants concede that the Casino Act was published in accordance with this requirement. Plaintiffs claim that had the legislature not intended the provision to be local, publication would not have been accomplished, and that because it was published forecloses the argument that it is not a local or special law.
Louisiana courts have repeatedly rejected this argument. See Knapp v. Jefferson-Plaquemines Drainage Dist., 224 La. 105, 68 So.2d 774 (1953); Richardson & Bass v. Board of Levee Comm'rs, 231 La. 299, 91 So.2d 353 (La.1955), appeal dismissed, Pottharst v. Richardson & Bass, 352 U.S. 948, 77 S.Ct. 325, 1 L.Ed.2d 241 (1956). The fact that the proponents complied with the requirement of notice for the enactment of local or special laws does not, of itself, make the enacted statutes local or special laws. Knapp, 68 So.2d at 777. An abundance of caution is what ordinarily prompts the proponents of legislation to take such action.
Plaintiffs also contend that the Casino Act is a local law because it can only operate in a particular locality, Orleans Parish, and that no possibility exists of extending its coverage to any other parish under any circumstance unless the legislature amends the statute. Likewise, the Polk plaintiffs contend that the Cruiseship Gaming Act constitutes a local or special law because it can only operate in the Parish of Orleans. Likewise, these plaintiffs assert that the Riverboat Gaming Act is a local or special law because it authorizes gambling only on specifically enumerated and designated waterways. Defendants counter that the acts benefit the entire state, they concern the welfare of the entire state, and they address an issue of statewide concern. Consequently, defendants contend that the acts constitute general laws.
Louisiana Const. art. III, § 12 does not, as a general proposition, prohibit the legislature from passing local or special laws. Bayou Cane Volunteer Fire Dep't v. Terrebonne Parish Consol. Gov't, 548 So.2d 915 (La.1989); Caddo Parish School Board v. Board of Elections Supervisors, 384 So.2d 448 (La.1980). Rather, it is only regarding certain enumerated subjects that the legislature may not pass local or special laws. Bayou Cane Volunteer Fire Cane Volunteer Dep't, 548 So.2d at 917. Thus, for a statute to withstand a constitutional challenge premised on its being a local or special law, two requisites must ordinarily be fulfilled if the statute is in fact a local or special law. First, the legislature must have complied with the notice requirement contained in La. Const. art. III, § 13. Second, the legislation must not concern one of the ten enumerated subjects contained in La. Const. art. III, § 12(A).
However, the words "local" and "special" are used in contradistinction to the word "general." State v. Dalon, 35 La.Ann. 1141, 1142 (1883). Thus, if the legislation is general rather than local or special, neither the prohibitions regarding the enumerated subjects nor the requirement for local advertisement apply. See Teachers' Retirement System v. Vial, 317 So.2d 179 (La.1975); Knapp, 68 So.2d at 777.
*1134 Interestingly, the terms "local" laws and "special" laws are not defined in the Louisiana Constitution. Similarly, the term "general laws" is not defined in La. Const. art. III, § 12, the article with which we are concerned.[5] Thus, the meaning of special or local and the meaning of general laws within the Article III context has as its primary source the jurisprudence of this Court.
Many states have adopted constitutional provisions prohibiting special or local laws under certain circumstances. Huntington Odom, General and Special Laws in Louisiana, 16 La.L.Rev. 768 (1956). These restrictions have been adopted to promote uniform legislation and to prevent the use of legislative influence to obtain special privileges for private individuals or groups. Id. These prohibitions further reflect the policy decision that the legislature should concentrate on matters of a general interest to the state, while local governments should address matters of local concern. Nevertheless, the distinctions between the termsgeneral on the one hand, and local or special on the other are not clear.
Louisiana courts have defined these terms in a variety of ways and have adopted myriad principles concerning them when deciding whether particular legislation violates the local or special law prohibitions of the constitution. General laws have been defined as "those that operate equally and uniformly upon all persons brought within the relations and circumstances for which they provide or that operate equally upon all persons of a designated class founded upon a reasonable and proper classification." Knapp, 68 So.2d at 777; Vial, 317 So.2d at 183. A law is general rather than local "if persons or things throughout the state are affected, or if it operates on a subject in which the people at large are interested." Kotch v. Board of River Port Pilot Comm'rs, 209 La. 737, 25 So.2d 527 (1946), aff'd, Kotch v. Board of River Port Pilot Comrs. 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 reh'g denied, Kotch v. River Port Pilot Comrs., 331 U.S. 864, 67 S.Ct. 1196, 91 L.Ed. 1869 (1947); Dalon, 35 La.Ann. at 1142-43. Conversely, a statute is considered special or local if its restrictions can affect only a portion of the citizens or a fraction of the property embraced within the created classification. Davenport v. Hardy, 349 So.2d 858 (La.1977). Alternatively stated, a general law, as distinguished from a local statute, is one which operates over the whole territory of the state instead of just a particular locality.
Nevertheless, a statute is not a local or special law within the meaning of the constitutional provision if persons throughout the state are affected, or if it operates on a subject in which the people at large are interested, even though its application and immediate effect is restricted to a particular locality. Kotch, 25 So.2d at 534; Dalon, 35 La.Ann. at 1142-43. Nor is the legislation a prohibited local or special law if it is in part general and in part special or local. Kotch, 25 So.2d at 534. Thus, the mere fact that a statute's immediate application is limited to a particular locality does not alone render the statute a local or special law. State v. Slay, 370 So.2d 508 (La.1979); State v. Labauve, 359 So.2d 181 (La.1978); Caddo Parish School Bd., 384 So.2d 448; Davenport v. Hardy, 349 So.2d 858; Knapp, 68 So.2d at 778; Kotch, 25 So.2d at 534; Dalon, 35 La. Ann. at 1143-44.
While this Court has noted that a statute is local if it operates in a particular locality without the possibility of extending its coverage to other areas should the requisite criteria *1135 of its statutory classification exist in other areas,[6] this principle is not operative in the situation where the legislature determines at the outset that a single facility of a certain sort within the state is in the state's best interest. In the present case, the legislature determined that a single land-based casino would best serve the interest of the people of the state. By pre-determination, the legislature decided to license a major single gambling facility and locate it, needless to say, in one place within the state. They chose as the best suited location the Rivergate site in New Orleans. So too, the legislature has determined that riverboats would best serve the interest of the state and its citizens. Such are legislative decisions which are beyond the province of the judiciary.
This Court has long recognized that the constitutional prohibition on designated types of local or special laws was not intended to restrict the use of legislative power to further the state's interest. See Kotch, 25 So.2d at 535-36; Dalon, 35 La.Ann. at 1142. See also Martin v. Louisiana Stadium & Exposition Dist., 349 So.2d 349 (La.App. 4th Cir. 1977). Rather, the prohibition was intended to prevent abuse of legislative power on behalf of special interests and to prohibit the exemption of an individual or private corporation from the operation of a general law. Id.
This premise is illustrated in Dalon, 35 La.Ann. 1141, and State ex rel. Grosch v. New Orleans, 211 La. 241, 29 So.2d 778 (1947). In Dalon, the court concluded that an act organizing the Criminal District Court for Orleans Parish only, was not a local or special law, but rather a general one. The court stated:
[General laws] are to be regarded as public acts which regulate the general interest of the State or any of its divisions.
Dalon, 35 La.Ann. at 1142. The court concluded that the challenged act was designed for "the common good of each and every member" of the state. Id. The court reasoned:
The real distinction between public or general laws and local or special laws is that the former affect the community as a whole, whether throughout the State or one of its subdivisions; and the latter affect private persons, private property, private or local interests.
Id. at 1144. Accordingly, the court rejected the defendant's argument, noting:
The argument that a law which relates solely to the machinery of a court of justice having jurisdiction over the territory of one parish only, is a local or special law, because it does not operate throughout the state and all parishes thereof, is perfectly preposterous, and so hollow that it cannot stand criticism.
Id. at 1143-44.
Similarly, in Grosch the court rejected the plaintiffs' assertion that an act fixing the salaries and the number of deputies, assistants, etc. of the Criminal Sheriff of the Parish of Orleans alone, was a local or special law. Plaintiffs argued that because the city of New Orleans had to pay the salaries, the people of New Orleans alone were concerned, and the people of the state were not interested. The court concluded that the law was a general law, reasoning:
The words "local" or "special" as used in... the constitution have been declared in numerous cases to refer to such laws wherein private individuals are seeking some private advantage or advancement for the benefit of private persons or property within a certain locality.
Grosch, 29 So.2d at 783.
The rationale of these cases is that while the immediate objective sought to be achieved may be local in character, the statutes are general laws because they pertain to matters of significant interest to the entire state and affect people throughout the state, even if some only indirectly. See Kotch v. Board of River Port Pilot for Port of New Orleans, 25 So.2d 527 (La.1946); State v. Dalon, 35 La. 1141 (1883). See also Peck v. New Orleans, 199 La. 76, 5 So.2d 508 (1941) (statute authorized voting machines in 63 parishes but mandated their use in Orleans Parish only); Knapp v. Jefferson-Plaquemines Drainage Dist., 224 La. 105, 68 So.2d *1136 774 (1953) (statute referred only to the parishes of Jefferson and Plaquemines and ratified the Jefferson-Plaquemines Drainage District's title only to certain property illegally acquired fifteen years previously at a tax sale). The courts' reasons further emphasize that the prohibition is intended to reflect a policy decision that legislative resources and attention should be concentrated upon matters of general interest, and that purely local matters should be left to local governing authorities.[7] H. Alston Johnson, Local or Special Legislation, 36 La.L.Rev. 549 (1976). Just as important, these cases reinforce the principle that the prohibition on local or special laws is not intended to restrict the legislature's ability to adopt legislation for the health, safety and general welfare of the citizens of the state. Martin, 349 So.2d at 359.
This Court recognized the validity of these principles in Kotch, 25 So.2d 527. In Kotch, the plaintiffs attacked an act which required specially appointed river pilots to navigate sea-going vessels operating on the Mississippi River between Pilot Town in Plaquemines Parish at the mouth of the river and Southport above New Orleans. The specially appointed pilots were only required in this limited geographic location. The act was inapplicable to all other waterways throughout the state. Despite the specific limited geographic application, the Court concluded that the act was a general law. The Court found that the statute was designed to promote the general welfare of the state. Quoting the Dalon passage noted above, the Court repeated that general laws "affect the community as a whole, whether throughout the state or one of its subdivisions; and [local or special laws] affect private persons, private property, private or local interests." Kotch, 25 So.2d at 534. The Court also reiterated that a statute is not local or special if persons or things throughout the state are affected or if it operates on a subject of statewide concern. Id. The Court in that case held that the term "local" does not pertain to geographical application but rather concerns whether the interests of private persons or private property has been advanced rather than the general interest of the state.
Moreover, Kotch recognized that laws adopted pursuant to the state's police power constitute general laws. The court determined that the statute was a regulatory one properly adopted by the legislature in the exercise of its police power, and explained:
A source of legislative authority is the police power of the state. Its exercise is in the promotion of the general welfare. The fact that the Legislature deemed it necessary to regulate pilotage on the Mississippi River between Southport and Pilot Town, but did not find it necessary to regulate pilotage in other parts of the state does not make the regulatory statute a local or special law.
Kotch, 25 So.2d at 534.
We conclude that the gaming laws do not constitute local or special laws for the purpose of La. Const. art. III for two reasons. First, the acts were adopted to benefit the entire state rather than in the interest alone of the Parish of Orleans or particular private individuals. Second, gambling constitutes a matter of legitimate state-wide concern and is rightfully amenable to regulation by the legislature pursuant to the state's police power. Unlike "local" or "special" laws, whose effects are designed to create an *1137 advantage for or advancement of private individuals, private property, private or local interests, or a single subdivision of the state, the gaming laws constitute laws of a statewide concern and were adopted for the benefit of the entire state. The legislature specifically stated that the Casino Act is "for a public purpose"to improve the Louisiana economy, improve tourism, and enrich the public fisc:
The development of a controlled gaming industry is important to the development of the economy of the state of Louisiana in that it will assist in the continuing growth of the tourism industry and thus will benefit the general welfare of our citizens ...
The legislature hereby recognizes that the gaming operations and activities are unique activities for state government and that a corporate structure will best enable the casino gaming to be managed in an entrepreneurial and business-like manner.
La.Rev.Stat.Ann. §§ 4:602(B), 640 (West Supp.1993). Simply stated, the gaming laws were adopted for the benefit of the entire state.[8]
Moreover, Louisiana courts have consistently recognized that the legislature's authority to regulate gambling constitutes a legitimate exercise of police power. Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515, 521 (La.1983); Ruston v. Perkins, 114 La. 851, 38 So. 583 (1905); State v. Mustachia, 152 La. 821, 94 So. 408 (1922). "Defining and prescribing means of suppression are left to the state Legislature and the legislative determination in this regard constitutes an appropriate exercise of police power for the protection of the public." Theriot, 436 So.2d at 521. The power to suppress gambling and to determine how, when, where, and in what respects gambling shall be prohibited or permitted has been delegated to the legislature and the legislature alone. The exercise of this function has long been recognized as constituting an appropriate exercise of police power. Id.
In the present case the legislature has determined that limited gaming activities are in the best interest of the state for the safety and welfare of its citizens. In reaching this conclusion, the legislature has properly exercised its authority. Therefore, we conclude that the Casino Act, the Riverboat Gaming Act, the Cruiseship Gaming Act, and the Video Poker Act constitute general laws rather than local or special laws. La. Const. art. III, § 12(A) and La. Const. art. III, § 13 have not been violated in the present case. Moreover, because the acts are general laws, La. Const. art. III, § 12(B) which addresses the indirect enactment of local or special laws by the partial repeal of a general law, is not relevant.
ARGUMENT #3Define and Suppress
Plaintiffs assert that the four statutes each violate the admonition to the legislature to "define" and to "suppress" gambling contained in La. Const. art. XII, § 6(B). They contend that when the legislature enacted these statutes it violated its mandate to suppress gambling because the acts did not suppress but rather authorized or licensed gambling. This Court has previously rejected this argument when construing more restrictive constitutional provisions contained in predecessor constitutions. Gandolfo v. Louisiana State Racing Comm'n, 227 La. 45, 78 So.2d 504 (1954).
The legislature's right to define gambling and in the process to exempt from that definition certain forms of gambling is not prohibited by the Constitution. Theriot, 436 So.2d at 517. Indeed, the present constitutional provision authorizes the legislature to do just that when it commissions the legislature to "define" gambling. The legislature's involvement in "defining" and "suppressing" gambling has long been recognized by the jurisprudence interpreting our state's constitutional provisions. Id. at 515; Lake Charles v. Marcantel, 125 La. 170, 51 So. 106 (1910); Ruston v. Perkins, 114 La. 851, 38 So. 583 (1905). See La. Const. of 1921, art. 19 § 8 (1921); La. Const. of 1913, arts. 178, 188, 189; *1138 La. Const. of 1898, arts. 178, 188, 189; La. Const. of 1879, arts. 167, 172; La. Const. of 1864, art. 116; La. Const. of 1845 art. 116. The 1974 Constitution incorporated that jurisprudence when for the first time it specifically granted the legislature the right to define gambling and used the very word, define. It provides: Gambling shall be defined by and suppressed by the Legislature. Defendants' view is supported by the historical development of this constitutional provision, the jurisprudence of this Court, and the 1973 constitutional convention debates.
Since 1845, the Louisiana Constitution has contained a self-operating prohibition on lotteries, which has read, "the buying or selling of lottery-tickets within the State is prohibited." La. Const. of 1845, art. 116.[9] With regard to gambling, however, no self-operating provision or mandatory prohibition has appeared in any Louisiana constitution in the history of the state. Rather, gambling was declared to be a "vice" in the 1879 Constitution, and the legislature was told to enact laws for its suppression. See also La. Const. of 1921, art. 19 § 8; La. Const. of 1913, arts. 178, 188, 189; La. Const. of 1898, arts. 178, 188, 189.
The legislature's constitutional assignment to suppress gambling thus began with the Constitution of 1879: "[g]ambling is declared to be a vice, and the General Assembly shall enact laws for its suppression." La. Const. of 1879, art. 172. That article of the 1879 Constitution was preceded by an art. 167, which granted the General Assembly "the authority to grant lottery charters or privileges... provided, further, that all charters shall cease and expire on the first of January, 1895, from which time all lotteries are prohibited in the State." Similarly, the Constitutions of 1898, 1913, and 1921 each provided: "Gambling is a vice and the Legislature shall pass laws to suppress it." Despite this purported barrier to gambling, this Court has consistently recognized that the provision regarding gambling is neither prohibitory nor self-executing. Thus, in the absence of legislative action, "gambling" has been permitted and indeed licensed, notwithstanding the constitutional provision. See Shreveport v. Maloney, 107 La. 193, 31 So. 702 (1902); Gandolfo, 78 So.2d at 514. In Maloney, the Court rejected the City of Shreveport's right to prosecute the defendants for operating "turf exchanges" in violation of a city ordinance. The Court explained that
[Louisiana Const. of 1898, art. 188] is not operative proprio vigore. The legislature has not deemed proper to carry out its mandate. Until it takes action, the article cited must remain without effect. To the legislature alone the power is delegated of legislating against gambling.
Maloney, 31 So. at 702. This opinion was cited with approval in Ruston v. Perkins, 38 So. 583. The Court noted that in Maloney, "it was held that article 188 of the Constitution is not self-operative, and therefore does not have the effect, proprio vigore, of outlawing all forms of gambling." Ruston v. Perkins, 38 So. at 584. The Court also stated in State v. Mustachia, 152 La. 821, 94 So. 408 (1922) that "the Legislature has not entirely prohibited gambling." In that case, the Court restated the proposition that the constitutional provision concerning gambling was "not self-operating, and gambling is a crime only to the extent to which the Legislature has declared it so." Mustachia, 94 So. at 409.
Admittedly, Maloney, Perkins, and Mustachia involved whether gambling matters were prohibited by law, rather than whether the legislature might authorize or license gambling. Nonetheless, these cases formed the backdrop for Gandolfo, the decision which has constituted the controlling jurisprudence of this Court since 1954. As earlier noted, the provision in effect in 1954 was that of the La. Const. of 1921, art. XIX, § 8, that "gambling is a vice and the Legislature shall pass laws to suppress it." In Gandolfo, the Court recognized that under this provision, gambling would not be prohibited, and was not prohibited, until and unless the legislature should pass laws to suppress it. The Gandolfo plaintiffs, landowners and taxpayers of Jefferson Parish, sought to enjoin the Louisiana State Racing Commission, its *1139 members, and a corporation licensed to conduct pari-mutuel wagering from allowing and conducting pari-mutuel and handbook wagering. Plaintiffs alleged that the statutes under which the Racing Commission issued the license, and which directed the commission to control wagering on horse racing, were unconstitutional because they authorized rather than suppressed gambling. The plaintiffs specifically asserted that pari-mutuel wagering on the harness races which were to be conducted at Magnolia Park was gambling and violated the state constitution.
Confronted by a statute that specifically permitted, and indeed licensed, commercial pari-mutuel betting on horse races, the Court rejected these arguments. The Court noted that the issues involved in the case had been "disposed of under identical provisions of the Constitution of 1898, as well as under the provisions of the [1921] Constitution." Id. The Court reached this conclusion after it reviewed the prior constitutional provisions, along with the 1921 provision and the cases under it. The Court concluded that the constitutional provisions had consistently "prohibited" lotteries, while not prohibiting gambling. Regarding the latter, the constitutional provisions merely admonished the legislature to determine what constituted impermissible gambling, and, upon doing so, to suppress it. The Court reaffirmed its previous rulings that the constitutional provision declaring that "gambling is a vice and the Legislature shall pass laws to suppress it" was not self-operative and that "there is delegated to the Legislature and the Legislature alone, the power to suppress gambling and to determine how, when, where, and in what respects gambling shall be prohibited or permitted." Gandolfo, 78 So.2d at 514. The court reached this conclusion after explaining:
When the constitutional convention of 1921 readopted Article 188 of the Constitution of 1898 as paragraph 1 of Article 19, Section 8 of the Constitution of 1921, it obviously was aware of the prior decisions of this court which held that Article 188 of the Constitution of 1898 was not self-operative, that the power to pass laws on this subject was vested exclusively in the Legislature and that the Legislature had full discretion to determine when, where and how gambling should be suppressed or permitted ... If the convention was not in accord with the interpretations placed upon Article 188 of the Constitution of 1898 by this court, it would undoubtedly have changed these provisions and made the first paragraph of Article 19, Section 8 of the Constitution of 1921 self-operative.
Id. at 513-14.
Such was the state of the jurisprudence of this Court at the time the delegates were assembled for the constitutional convention in 1973 and at the time the people voted on the constitution in 1974. Like the delegates of the 1921 constitutional convention, the delegates of the 1973 constitutional convention were aware of the existence of this line of jurisprudence and of the legislature's role in defining and suppressing gambling. Despite these prior decisions, the delegates rejected a chance to prohibit gambling specifically, and thus make the provision on gambling self-operative, something which they deliberately chose to do concerning lotteries. In fact, the delegates overwhelmingly rejected a proposal which would have prohibited gambling. This version had read:
Section 12. Gambling Prohibited. All forms of gambling, including without limitation, lotteries, pari-mutuel betting, pinball machines, football cards, printing of point spreads, bingo, dice, card games and other games of chance shall be prohibited in this state....
Instead the delegates opted for the status quo, i.e., to allow the legislature the sole discretion to determine what constitutes gambling and what forms, if any, to prohibit.
Moreover, the debates on the floor of the convention reveal that the delegates knew that the language adopted would permit regulated gambling:
MR. JENKINS:
Mr. Gravel, I want to ask you a little bit about the section as it now stands without your amendment.
The first thing, "gambling is a vice. The Legislature shall pass laws to suppress it. They can enact penalties with regard to it. Sale of lottery tickets is prohibited, etc."
*1140 Does that in any way prevent the State of Louisiana from ever allowing a Nevada-type, completely open gambling situation? Does the present section in any way prohibit that?
MR. GRAVEL:
Under the Gandolfo case, I don't think it would.
MR. JENKINS:
In other words, so long as the legislature has not enacted specific criminal penalties for specific offenses, then really, slot machines, dice games, keno ... anything is completely legal ... or it could be completely legal so long as there are no criminal penalties specifically enacted by the legislature.
MR. GRAVEL:
If we didn't have Article 90 of the Criminal Code, if we didn't have the statute prohibiting it, the constitution would not prohibit it under the Gandolfo case. That's correct.
MR. JENKINS:
Wouldn't the only way that we could really prohibit the Nevada-type situation in Louisiana, would be to enact a detailed criminal provision that we made self-executing and put it in this constitution?
MR. GRAVEL:
That's correct. Or, by statute.
MR. JENKINS:
No. But, the only way we could do it as a convention would be to do that.
MR. GRAVEL:
Oh, I agree with you....
Verbatim Transcripts, Vol. IX, 113th Day, January 9, 1974, 3228-29.
Likewise, the exchange between Delegates Chatelain and Zervigon reveal the delegates' intent to preserve the legislature's role in defining, suppressing, and regulating gambling:
MRS. ZERVIGON:
I'd like to follow up a little on what Mr. Lanier was asking you. We haven't put a definition of "gambling" in the constitution in any place, have we?
MR. CHATELAIN:
Not to my knowledge
MRS. ZERVIGON:
So, the legislature would still continue its job of defining "gambling" wouldn't it?
MR. CHATELAIN:
I would guess so.
Verbatim Transcripts, Vol. IX, 113th Day, January 9, 1974, 3223.
The proposal which became art. XII, § 6 originally declared that gambling shall be defined by and prohibited by the legislature. When questioned why he chose the word "prohibited" rather than "suppressed" the author, to accomplish his goal of barring gambling throughout the state, stated:
Because ... of the Gandolfo case. The word "suppresses" apparently had no meaning to the Supreme Court of Louisiana when they said that you could have commercial gambling in the form of pari-mutuel betting and it didn't violate that provision of the constitution.
Verbatim Transcripts, Vol. IX, 113th Day, January 9, 1974, 3228. The delegates thereupon rejected this proposal, which would have "prohibited" gambling. Instead, by subsequently adopting an amendment which mirrored the 1921 "suppression" language rather clearly, they perpetuated the jurisprudence which conferred on the legislature the role of "defining" and regulating gambling. The delegate who introduced the successful amendment stated:
This idea merely is to delete the word "prohibit" and substitute in lieu thereof the word that is now used in the constitution, and that is the word "suppressed." There may be a connotation that the word "prohibition" certainly may be much stricter and more prohibitive, and the word "suppressed" is something that we have jurisprudence on today, that has already been interpreted ... I'm very fearful of the use of the word "prohibit" because that may be a mandatory obligation placed upon the legislature that they completely outlaw anything that could have a connotation of gambling....
. . . . .
Verbatim Transcripts, Vol. IX, 113th Day, January 9, 1974, 3233.
*1141 The delegates also eliminated the moral condemnation of gambling by removing the phrase "gambling is a vice," which had appeared in the 1921 and predecessor constitutions. The delegates specifically rejected a proposed amendment which would have maintained this denunciation. Moreover, the debates further disclose that the delegates were aware that the provision concerning lotteries was self-executing and prohibited lotteries. Nevertheless, as discussed previously, the delegates decided to maintain the gambling provision's nonself-executing status, thus assuring that the legislature would maintain its role concerning gambling. What can be gleaned from the convention's treatment of the issue is that the legislature would continue its role of "defining" gambling and thereby authorizing gambling or outlawing gambling as it chose.
In summary, the 1973 convention delegates, aware of the established jurisprudence interpreting the previous gambling provisions, made three changes to the 1921 language. First, they removed the moral condemnation that gambling is a vice. Second, they adopted the word "suppressed", rather than "prohibited." Finally, they stated, explicitly, for the first time in a Louisiana constitution, that the legislature shall "define" gambling, an obvious constitutional incorporation of the Gandolfo language regarding "how, when, where and in what respects gambling shall be prohibited or permitted."
Whatever the merits of the Gandolfo decisionand it was not without its critics (note the dissents of Justices Hamiter and Hawthorne)it was the prevailing decision from this Court at the time and it was the decision which influenced the thinking of the delegates and the language of the constitution. For these reasons, we conclude that the jurisprudence established under La. Const. of 1921 continues to govern the existing provision. The legislature has the power to "determine how, when, where, and in what respects gambling shall be prohibited or permitted." Plaintiffs have not sustained their burden of proving clearly and convincingly that La. Const. art. XII, § 6 prohibited the legislature from enacting the four acts concerning the licensing and regulation of gambling. Moreover, considering the foregoing analysis and that legislation is presumed to be constitutional, we conclude that neither the Casino Act, the Riverboat Gaming Act, the Cruiseship Gaming Act, nor the Video Poker Act violate La. Const. art. XII, § 6. Considering the absence of a specific constitutional prohibition, we find that these four acts are well within the legislature's police power and are also within the legislature's plenary power otherwise.

ARGUMENTS #4 & 5
Opponents of the Casino Act contend that the statute unconstitutionally delegates legislative authority to the executive branch of government. [State government is divided into three separate branches, legislative, executive, and judicial. La. Const. art. II, § 1. Furthermore, art. II, § 2 provides that one branch shall not exercise power granted to either of the others.]
The power and duty to define gambling was granted to the legislature in La. Const. art. XII, § 6(B). In defining gambling, the legislature excluded games conducted on board commercial cruiseships, upon riverboats as defined and authorized, and at the official gaming establishment as defined and authorized. Plaintiffs contend that this power to define gambling has been relinquished by the Legislature in the Casino Act, as well as in the Cruiseship Gaming Act and the Riverboat Gaming Act. With regard to the Casino Act, they reason that the Casino Corporation, whose members are appointed by the governor and whose president is selected by the members of the Board, subject to the approval of the governor, is part of the executive branch of government. Since La.Rev. Stat.Ann. § 4:620(B) (West Supp.1993) permits the Board of the Casino Corporation to determine the types of games to be operated, plaintiffs suggest that the power to define gambling has thereby been relinquished to the executive branch. They claim that a similar analysis is applicable to the Cruiseship Gaming Act and to the Riverboat Gaming Act.
In State v. Morgan, 238 La. 829, 116 So.2d 682 (1959), defendant urged that a statute, which made it unlawful to introduce certain articles declared to be contraband onto the *1142 grounds of a penal institution "except through regular channels," was an unconstitutional delegation of legislative power to an administrative officer. This provision was challenged on the grounds that it left to the officer in charge the determination of when an action was a crime. Although it was argued that the prison officials could make certain conduct criminal within their jurisdiction by simply banning certain procedures for bringing items into prison, this Court had "no difficulty in holding ... that the provision under attack is constitutional." Id., 116 So.2d at 687.
In this case, opponents complain that the legislature has relinquished its power to define certain conduct as gambling, and thus has relinquished its power to define criminal activity. We disagree. Having defined gambling in La.Rev.Stat.Ann. § 14:90 as "the intentional conducting, or directly assisting in the conducting, as a business, of any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit," the legislature specifically excluded from its definition gaming activities or operations on board a commercial cruiseship, upon a riverboat, and at the official gaming establishment. No gaming activities which the Casino Board, or boat operators, or licensees may choose to conduct at these locations constitute gambling, according to the legislature. The Board, operators and licensees can add nothing to the legislature's definition of gambling. By designation, they can create no criminal activity regarding gambling at these locations, and they have no authority beyond the limits of the cruiseship, riverboat, or the official gaming establishment.

ARGUMENT # 6
Plaintiffs contend that the Casino Act, the Riverboat Gaming Act, and the Video Poker Act violate La. Const. art. VI, § 4 because they abrogate taxing powers granted to the city of New Orleans pursuant to its home rule charter. La. Const. art. VI, § 4 provides:
Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted. If its charter permits, each of them also shall have the right to powers and functions granted to other local governmental subdivisions (emphasis added).
Rather than granting express powers to local governmental subdivisions, the Louisiana Constitution grants broad revocable powers to local governments. Francis v. Morial, 455 So.2d 1168 (La.1984). However, this grant of power is not absolute. Rather the powers granted are those that "are not (a) inconsistent with the 1974 constitution or (b) denied them by general legislation. Art. VI, Sections 4, 5(E), 7(A)." Shreveport v. Kaufman, 353 So.2d 995, 997 (La.1977). Moreover, to prevent the danger that the powers afforded local government would be used to deprive the state government of its necessary inherent powers, La. Const. art. VI, § 9(B) was adopted. Francis v. Morial, 455 So.2d 1168. Article VI, § 9(B) provides that "[n]otwithstanding any provision of this Article, the police power of the state shall never be abridged." While this Court has acknowledged that the term "police power" is best defined on a case by case basis, it is generally described as the inherent power of the state to govern persons and things for the promotion of general security, health, morals, and welfare. Id. Thus, "the autonomy of local governmental subdivisions with home rule charters is limited by general legislation enacted under the State's police power." New Orleans v. State, 426 So.2d 1318, 1321 (La.1983). Furthermore, the legislature's right to exercise police power may not be irrevocably alienated, surrendered, or abridged. Board of Comm'rs v. Dep't of Natural Resources, 496 So.2d 281, 289 (La. 1986). Although the legislature may delegate the exercise of police power, the power belongs to the state and its delegation can be recalled, abrogated, or modified. Id. Furthermore, when necessary to prevent *1143 abridgement of a reasonable and valid exercise of the state's police power, the legislature may by a general law adopted pursuant to the police power deny or revoke the initial delegation of home rule powers and functions. Francis v. Morial, 455 So.2d at 1169.
Prior to the effective date of the Constitution of 1974, the powers of the city of New Orleans included the right to "levy, impose and collect any ... taxes or licenses or fees... that are necessary for the proper operation and maintenance of the municipality...." 1936 La.Acts 338, § 1(f). According to the Court in Mouledoux v. Maestri, 197 La. 525, 2 So.2d 11, 17 (1941), which considered this grant of authority to the city of New Orleans, the taxing power is vested in the legislature by the state and is delegated, rather than surrendered, to the city by its charter. Accordingly, the taxing power entrusted to the city can be revoked or modified at the direction of the legislature. Id. at 16; Liter v. Baton Rouge, 258 La. 175, 245 So.2d 398 (1971); Louisiana Recovery District, 529 So.2d 384. La. Const. art. VII, § 1, which provides in pertinent part that "the power of taxation shall be vested in the legislature, shall never be surrendered, suspended, or contracted away," reaffirms the cited holding. The United States Supreme Court also recognized this principle as early as 1879. United States v. New Orleans, 98 U.S. (8 Otto) 381, 25 L.Ed. 225 (1879). In this case, the Court acknowledged that "the power of taxation belongs exclusively to the legislative branch of government." 98 U.S. at 392. Nevertheless, the Court recognized that the legislature could delegate taxing authority to municipalities. The Court stated:
The position that the power of taxation belongs exclusively to the legislative branch of government, no one will controvert. Under our system it is lodged nowhere else. But it is a power that may be delegated by the Legislature to municipal corporations ... for better administration of the government in matters of local concern.
Id. at 392-3.
In enacting the Casino Act, the legislature exempted operations of the Casino Corporation from taxation by the city of New Orleans while imposing a state tax on the casino.[10] Similarly, both the Video Poker Act and the Riverboat Gaming Act also restrict the city in the exercise of its right to levy and collect taxes, licenses, or fees on these activities. The statutes permit only an occupational license on the operation of video draw poker devices within its jurisdiction in an amount not to exceed fifty dollars per device and an admission fee of up to two and one-half dollars for each passenger boarding a riverboat. According to the legislative statements of policy in La.Rev.Stat.Ann. §§ 4:602(B)(1) and § 4:640(3) (West Supp.1993), the Casino Act is designed to promote "the development of the economy of the state of Louisiana" and to "protect the public health, safety, morals, good order, and general welfare of our citizens."
The cited jurisprudence reveals that the power to tax, delegated to the city of New Orleans, can be modified by the legislature. Furthermore, the constitution reserves power to the legislature by general law to deny or revoke the delegation of a function or power to a home rule government when necessary to prevent an abridgement of the state's police power. The gaming acts constitute general laws enacted pursuant to a valid exercise of the state's police power which would be abridged if the legislature were prevented from adopting them. Consequently, we conclude that the plaintiffs' assertion that three acts violate La. Const. art. VI, § 4 is without merit.

ARGUMENT # 7
The Reily plaintiffs, joined by the Polk plaintiffs, contend that the Casino Act violates La. Const. art. VI, § 17 by interfering with the authority of the city of New Orleans to regulate land use, zoning, and historic preservation. La. Const. art. VI, § 17 provides:
Subject to uniform procedures established by law, a local governmental subdivision *1144 may (1) adopt regulations for land use, zoning, and historic preservation, which authority is declared to be a public purpose; (2) create commissions and districts to implement those regulations; (3) review decisions of any such commission; and (4) adopt standards for use, construction, demolition, and modification of areas and structures. Existing constitutional authority for historic preservation commissions is retained.
Plaintiffs contend that the provisions of the Casino Act which impose certain limitations on local government's ability to regulate these operations impermissibly interfere with authority constitutionally vested in the city of New Orleans. Under the Casino Act, La. Rev.Stat.Ann. § 4:627(A) (West Supp.1993), "[c]orporation operations are exempt from and no political subdivision may enact any measure to require licensing, to regulate, to impose fees, or to tax corporation operations."
We see no conflict between the constitutional right of a local governmental subdivision to regulate land use, zoning, and historic preservation and the statutory provisions which exempt the operations of the Casino Corporation from certain authority of the local governing authority. The statute's focus is not on land use, zoning, or historic preservation, but on licensing, taxing, and fee imposition on the internal affairs of the corporation.

ARGUMENT #8
Opponents to the Casino Act contend that it violates La. Const. art. VI, § 14(A) by increasing the financial burden on the city of New Orleans without appropriating funds to meet the burden or authorizing the city to raise the additional revenue. Louisiana Const. art. VI, § 14(A) provides:
No law or state executive order, rule, or regulation requiring increased expenditures for any purpose shall become effective within a political subdivision until approved by ordinance enacted, or resolution adopted, by the governing authority of the affected political subdivision or until, and only as long as, the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount that such funds are provided, or until a law provides for a local source of revenue within the political subdivision for the purpose and the affected political subdivision is authorized by ordinance or resolution to levy and collect such revenue and only to the extent and amount of such revenue. This Section shall not apply to a school board (emphasis added).
Although the record contains no evidence of city expenditures which will be required as a direct result of the opening and operation of the casino, the opponents to the Casino insist that the Casino Act imposes numerous additional costs on the city of New Orleans. In brief, they recite statistics from a report to the New Orleans City Council which suggest the need for new city employees, street improvements, and supplies and equipment.
The relevant constitutional article was amended in 1991 to re-write subsection A and to add a subsection B. With certain exceptions, it restricts the state's power to enact legislation requiring the expenditure of funds by local political subdivisions unless certain conditions are met. Even without specific evidence concerning these anticipated costs, we can reasonably assume that some increased expenditures will follow construction of the Casino. The question is whether the Casino Act requires these expenditures, as contemplated by art. VI, § 14(A).
In New Orleans v. State, 426 So.2d 1318 (La.1983), the city unsuccessfully challenged the constitutionality of various state statutes which mandated payments by the city for state services under the article as enacted in 1974.[11] In that case, various acts required *1145 the city to pay the salaries of the messengers of the Criminal District Court, the coroner and his employees, the clerks and deputy clerks of the Criminal District Court, and other state officials serving local needs. Additionally, state acts required the city to pay $350,000.00 annually to the City Park Improvement Association and to provide quarters for the Orleans Parish Juvenile Court and the Criminal District Court. Since the salaries involved were paid to state rather than to city employees, and since the existing constitutional provision did not specifically limit the legislative power to act in other respects, art. VI, § 14 was found to be inapplicable. Id. at 1321. Although the relevant article has now been amended in non-relevant particulars, the case is instructive in providing examples of state laws or regulations which did specifically require increased expenditures by a political subdivision.
We find that La. Const. art. VI, § 14(A), which prohibits the state from requiring increased expenditures by a political subdivision without its approval and without appropriating the funds or providing a local source of revenue, is not violated. The Casino Act itself does not mandate the added expenses allegedly suggested to the New Orleans City Council, and the constitutional provision was not intended to prohibit the indirect effect on a community's coffers created by economic development legislation. Although the city's failure to hire additional police officers and fire fighters after the establishment of the Casino might be deemed unwise, perhaps "irresponsible" as Casino opponents contend, it would not be in violation of the act.

ARGUMENT #9
Opponents also take the position that the District Court was correct in finding unconstitutional the provision of the Casino Act which required that employees of the Casino Corporation be non-civil servants but was incorrect in finding this unconstitutional provision severable. They would have us declare the Casino Act unconstitutional because of the unconstitutional feature regarding civil service. Our discussion and resolution at this portion of the opinion will also entail review of the district court's ruling adverse to the defendants that non-civil service feature of the Casino Act is unconstitutional.
Pursuant to La.Rev.Stat.Ann. § 4:610 (West Supp.1993), a "special corporation to be operated for a public purpose," known as the Louisiana Economic Development and Gaming Corporation (the "Casino Corporation"), was created and established. La.Rev. Stat.Ann. § 4:625(A) (West Supp.1993) permits that corporation to establish and maintain a personnel program, and specifically excludes its employees from civil service. Since La. Const. art. X, § 1(A) provides that state civil service applies to all employees of the state, as well as to any instrumentality of the state, opponents of the Casino Act contended and the trial court found that § 4:625(A) is unconstitutional. From this judgment, defendants have appealed.
At issue is whether the Casino Corporation is an agency or instrumentality of the state. If so, it is constitutionally mandated that its employees be included within the state civil service system, since they are not otherwise excluded by its terms. Louisiana Const. art. X, § 1(A), which was derived from La. Const. of 1921, art. XIV, § 15, provides that:
The state civil service is established and includes all persons holding offices and positions of trust or employment in the employ of the state, or any instrumentality thereof, and any joint state and federal agency, joint state and parochial agency, or joint state and municipal agency, regardless of the source of the funds used to pay for such employment. It shall not include members of the state police service as provided in Part IV of this Article or persons holding offices and positions of any municipal board of health or local governmental subdivision.
La. Const. art. X, § 2 divides state civil service into unclassified and classified service. Unclassified employees are those whose relations with their employer, the state, are not governed by the civil service provisions. Knecht v. Board of Trustees for *1146 State Colleges & Universities, 591 So.2d 690, 692 (La.1991). Unclassified service includes elected officials, heads of each principal executive department, city attorneys, and others. Nevertheless, the unmistakable intent in the creation of the state civil service system is to include within its scope all employees, officers, agents, and officials of the state, except those expressly designated therein as unclassified employees. In re Bankston, 306 So.2d 863, 868 (La.App. 1st Cir.1974).
According to the Casino Act itself, the Casino Corporation is not a state agency, except as expressly provided in the Act (i.e., for purposes of the ethics laws).[12] La.Rev. Stat.Ann. § 4:604 (West Supp.1993). The trial court, however, concluded that notwithstanding this legislative characterization of the Casino Corporation, it is an instrumentality of the state. In his oral reasons for judgment, the trial judge noted:
I cannot in good conscience say that this is not a state instrumentality. The governor appoints the board with concurrence of the senate. He can remove for cause. I think he appoints the chairman of the board. The state is totally involved with this corporation, special corporation.
They use the Administrative Procedures Act of the state, they use the Procurement Code of the state....
Indeed, it is conceded that this corporation is owned by the state, established to advance the interests of the state and to carry out a public purpose,[13] and accountable to state government. According to La.Rev.Stat. § 4:602(A) (West Supp.1993), the corporation is "accountable to the governor, the legislature, and the people of the state through a system of audits, reports, and legislative oversight, and through financial disclosure...." That accountability is also apparent in the corporate organization, which features a board of directors composed of seven members appointed by the governor and confirmed by the Senate. La.Rev.Stat.Ann. § 4:611(A)(1) (West Supp.1993). According to § 4:612(A) (West Supp.1993), the board members themselves appoint a president, but with the approval of the governor. The president, in turn, employs a vice president and a secretary-treasurer, who serve at his pleasure. All officers and employees are employed full-time and may not engage in any other occupation for remuneration while working for the corporation. In accordance with § 4:625(A) (West Supp.1993), employees of the corporation serve at the pleasure of the president and are subject to suspension, dismissal, reduction in pay, demotion, transfer, or other personnel action, at his discretion.
The Casino Act has granted to the corporation and its board of directors extensive power to conduct gaming operations in general. Pursuant to § 4:620(B) (West Supp. 1993), the board of directors is empowered to adopt rules for the conduct of specific games and gaming operations, including the types of games to be conducted, the granting of credit to a patron, and special procedures for making and soliciting requests for major procurement. In order to provide the greatest long-term benefit to the state, however, § 4:621(6)(a) (West Supp.1993) provides that contracts to acquire an item, service, or product in the amount $100,000.00 or more should be authorized pursuant to the Louisiana Procurement Code or special procedures adopted by the corporation. Furthermore, § 4:620(C) (West Supp.1993) requires that any rule, regulation, or special procedure of the board will include legislative oversight and publication of notice of intent in accordance with the Administrative Procedure Act, La.Rev.Stat.Ann. § 49:953(A) (West Supp.1993), except that the notice may be published either in the official journal of the state or the state register. Should complaints charge violations of the Casino Act or *1147 of administrative regulations adopted by the corporation, § 4:631(A)(5) (West Supp.1993) authorizes the corporation to conduct hearings, and § 4:631(D) (West Supp.1993) grants to the corporation the power to issue subpoenas, to compel the attendance of witnesses, and to punish as contempt the failure to obey its orders.
It has been held that such broad regulatory powers could not be delegated to a private or non-governmental agency. State Licensing Board of Contractors v. State Civil Service Comm'n, 110 So.2d 847, 849 (La.App. 1st Cir.1959), aff'd, 240 La. 331, 123 So.2d 76 (1960). Despite the argument of the Board of Contractors that the legislature did not intend that civil service requirements be applicable,[14] that the Board is not a state agency within the definition of the civil service amendment, and that its operations were financed by fees collected by the Board itself rather than by state appropriations, the court of appeal concluded that the employees of the State Licensing Board for Contractors were subject to the civil service amendment to the La. Const. of 1921. Noting that the members of the State Licensing Board for Contractors are appointed by the governor, that the Board was required to report annually to the governor, that the license fee fixed by the Board must be approved by the governor, and that the fees are not voluntary private contributions by the contractors but are levied through the exercise of state governmental powers, the court found that the Board was clearly a state board or agency. Id. The court's reasoning is persuasive.
After considering its powers and functions, as well as its interrelationship with the state in many areas, we find that the Casino Corporation is an instrumentality of the state and is subject to the provisions of the civil service system. The Casino Corporation does not enjoy an existence separate from the state. It does not independently transact its business and hire its personnel. Furthermore, its actions determine the progress of the gaming industry, which the legislature has designed to assist the growth of tourism and generate revenue as a benefit to the general welfare. To treat this legislative entity as a nongovernmental agency outside of the civil service system would effectively emasculate the constitutional provision, which mandates civil service for "all persons holding offices and positions of trust or employment in the employ of ... any instrumentality" of the state.
We are not persuaded otherwise by the federal analogy wherein the state attempts to compare the Casino Corporation to the National Railroad Passenger Corporation ("Amtrak") and to the Corporation for Public Broadcasting. Indeed, 45 U.S.C. § 541, which creates Amtrak, and 47 U.S.C. § 396, which creates the Corporation for Public Broadcasting, also provide that the respective corporations will not be agencies or establishments of the United States Government. Although federal district and appeal courts have upheld that statutory language, they have done so only so as to conclude that actions by these corporations do not equate with governmental action. Furthermore, the cases have not involved the applicability of the civil service system, which, in Louisiana at least, rises to constitutional status. See, e.g., Ehm v. Nat'l R.R. Passenger Corp., 732 F.2d 1250 (5th Cir.1984); Marcucci v. Nat'l R.R. Passenger Corp., 589 F.Supp. 725 (N.D.Ill.1984); Network Project v. Corp. for Public Broadcasting, 398 F.Supp. 1332 (Dist. D.C.1975), rev'd on other grounds 561 F.2d 963 (D.C.Cir.), cert. denied 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1977).
Opponents contend that the civil service provision of the Casino Act, La.Rev.Stat.Ann. § 4:625(A) (West Supp.1993), cannot be severed from the statute. To do so, they argue, would frustrate the apparent and central legislative intent in passing the Casino Act. *1148 Severability is addressed in La.Rev.Stat.Ann. § 24:175 (West 1989). It provides as follows:
A. Unless otherwise specifically provided therein, the provisions of each act of the legislature are severable, whether or not a provision to that effect is included in the act. If any provision or item of an act, or the application thereof, is held invalid, such invalidity shall not affect other provisions, items, or applications of the act which can be given effect without the invalid provision, item, or application.
Enacted in 1982, this section makes clear that, despite the invalidity of a portion of an act of the legislature, the remainder need not be rendered invalid. As long as the act contains no bar to severability and the remainder, standing alone, can be given effect, it can stand. According to the jurisprudence, "[t]he test for severability is whether the unconstitutional portions of the statute are so interrelated and connected with the constitutional parts that they cannot be separated without destroying the intention manifested by the legislature in passing the act." State v. Azar, 539 So.2d 1222, 1226 (La.), cert. denied, Azar v. Louisiana, 493 U.S. 823, 110 S.Ct. 82, 107 L.Ed.2d 48 (1989) (citing Cobb v. Louisiana Bd. of Institutions, 237 La. 315, 111 So.2d 126 (1958)). Where the purpose of the statute is defeated by the invalidity of part of the act, the entire act is void. Conversely, however, when the general object of the act can be achieved without the invalid part, the act will be upheld. Roy v. Edwards, 294 So.2d 507 (La.1974); State v. Johnson, 343 So.2d 705 (La.1977).
In this case, we must consider whether La.Rev.Stat.Ann. § 4:625(A), which excludes employees of the Casino Corporation from civil service, is severable from the remainder of the Casino Act. The Casino Act itself contains no bar to the severability of the provision. What remains to be determined, then, is whether the statute can be given effect without the invalid provision, whether the legislative intent in passing the act will be destroyed with the exclusion of the unconstitutional portion.
In passing the Casino Act, the legislature decided that "[t]he development of a controlled gaming industry is important to the development of the economy of the state." La.Rev.Stat.Ann. § 4:602(B)(1) (West Supp. 1993). There is no reason to conclude that the legislative intent to establish a controlled gaming industry for economic benefit cannot be accomplished by the Casino Corporation if its employees are subject to civil service. As stated by the trial judge in written reasons for judgment,
Clearly, the Legislature is concerned that the casino be free from crime and corruption. The objectives regarding such regulations cannot be adversely affected by subjecting the gaming corporation employees to Civil Service. In fact, the Court feels that subjecting the employees to Civil Service will only further public confidence and trust in the gaming operations.
Since we agree that the legislative intent in passing the act will not be destroyed by the elimination of that portion of § 4:625(A) which excludes employees of the Casino Corporation from civil service, we find that unconstitutional provision severable from the Casino Act.

DECREE
For the foregoing reasons, we affirm the judgments of the district court. Because the plaintiffs and defendants in these cases have each been successful in part, this Court assesses costs equally between them.
AFFIRMED.
ORTIQUE, J., joins in the opinion but adds compelling concurring reasons.
ORTIQUE, Justice, concurring.
The majority correctly holds that the four (4) statutes which authorize the licensing of gaming operations in the State of Louisiana are constitutional, with the exception of the provision of La.R.S. 4:625(A) which excludes employees of the Casino Corporation from coverage of the civil service laws of this State. I concur in the result reached by the majority, however, I believe there are additional reasons compelling the conclusion of constitutionality.
Plaintiffs' contention that the gaming statutes were enacted in violation of Art. III, § 12 of the 1974 Louisiana Constitution because *1149 they are local or special laws or because they create a local or special law by repealing a general law lacks merit. Publication of a law is not determinative of a law's status as local or special. Richardson & Bass v. Board of Levee Comm'rs, 231 La. 299, 91 So.2d 353 (1955), appeal dismissed, sub nom. Pottharst v. Richardson & Bass, 352 U.S. 948, 77 S.Ct. 325, 1 L.Ed.2d 241 (1956); Knapp v. Jefferson-Plaquemines Drainage Dist., 68 So.2d 774 (La.1953). However, even if the statutes are construed to be local or special, they pass constitutional muster on this issue, given the fact that the statutes do not pertain to prohibited subject matter areas set out in Art. III, § 12(A) of our Louisiana Constitution. The redactors clearly annunciated these prohibitions as:
(1) For the holding and conducting of elections, or fixing or changing the place of voting.
(2) Changing the names of persons; authorizing the adoption or legitimation of children or the emancipation of minors; affecting the estates of minors or persons under disabilities; granting divorces; changing the law of descent or succession; giving effect to informal or invalid wills or deeds or to any illegal disposition of property.
(3) Concerning any civil or criminal actions, including changing the venue in civil or criminal cases, or regulating the practice or jurisdiction of any court, or changing methods for the collection of debts or the enforcement of judgments, or prescribing the effects of judicial sales.
(4) Authorizing the laying out, opening, closing, altering, or maintaining of roads, highways, streets, or alleys; relating to ferries and bridges, or incorporating bridge or ferry companies, except for the erection of bridges crossing streams which form boundaries between this and any other state; authorizing the constructing of street passenger railroads in any incorporated town or city.
(5) Exempting property from taxation; extending the time for the assessment or collection of taxes; relieving an assessor or collector of taxes from the performance of his official duties or of his sureties from liability; remitting fines, penalties, and forfeitures; refunding moneys legally paid into the treasury.
(6) Regulating labor, trade, manufacturing, or agriculture; fixing the rate of interest.
(7) Creating private corporations, or amending, renewing, extending, or explaining the charters thereof; granting to any private corporation, association, or individual any special or exclusive right, privilege or immunity.
(8) Regulating the management of parish or city public schools, the building or repairing of parish or city schoolhouses, and the raising of money for such purposes.
(9) Legalizing the unauthorized or invalid acts of any officer, employee, or agent of the state, its agencies, or political subdivisions.
(10) Defining any crime.
These gaming statutes fall not within the ambit of prohibitions recited hereinabove.
The statutes in question were enacted in furtherance of a general purpose. The Legislature clearly set out the purpose of the statutes in La.R.S. 4:602 B, a purpose which the Legislature believes will have a positive impact upon the entire state. Although the statutes may directly impact only a few political subdivisions within the state, the indirect impact of the implementation of these statutes will enure to the benefit of all citizens of Louisiana; consequently, the statutes are general and not in violation of Art. III, § 12. Davenport v. Hardy, 349 So.2d 858 (La. 1977).[1]
Plaintiffs argue that the statutes reflect the Legislature's failure to suppress gambling in accordance with the requirement set out at Art. XII, § 6(B) of the 1974 Louisiana Constitution. Plaintiffs suggest that the *1150 term "suppress" dictates a legislative prohibition of gambling. Other jurisdictions have addressed this issue and have arrived at conclusions consistent with that of our Legislature, this court and our concurrence in the instant case. In Johnson v. Town of Philadelphia, 94 Miss. 34, 47 So. 526 (1908), the court found that a codal section giving a municipality the power to regulate and suppress "does not carry with it the power to prohibit." 47 So. at 527 (emphasis added). A statute conferring upon a city the power to regulate or suppress billiard tables was held to grant the power to suppress unlicensed billiard tables doing business without a license, but not the power to prohibit billiard tables. City of Meadville v. Caselman, 240 Mo.App. 1220, 227 S.W.2d 77 (1950). The right to suppress has also been defined as a right to restrict in a reasonable manner. Stevenson v. Salt Lake City Corp., 7 Utah 2d 28, 317 P.2d 597 (1957). We found no clear definition of the term suppress in any jurisprudential discourse in Louisiana.
Because the power to suppress does not necessarily entail prohibition, our Legislature's restriction of gambling in a reasonable manner does not constitute an abdication of its responsibility to suppress gambling. Each of the statutes at issue confine gaming to certain locations within the State, place restrictions on the operation of gaming establishments, provide a licensing scheme which includes suitability requirements in order to foster public confidence and trust. Within these parameters, the Legislature has clearly fulfilled its constitutionally established obligation to suppress gambling.
Plaintiffs' further contend that the statutes create an unconstitutional delegation of legislative authority to the executive branch in violation of Art. II, § 2 of the 1974 Constitution. The delegation which is allegedly unconstitutional arises out of the statutes' placement of the function of deciding what games will be played in the hands of the Casino Board. Plaintiffs conclude that by granting the Casino Board the power to determine the games played somehow results in the Casino Board defining gambling.
The Legislature's duty to define gambling imposed by the Constitution empowers the Legislature to say what is and what is not gambling. By enacting legislation which provides the mechanism by which a casino is to be established and regulated, the Legislature has determined that those activities which normally take place in casinos must be regulated in order not to do violence to its mandate to suppress gambling. Plaintiffs suggest that the Legislature's failure to list specific activities which constitute gambling results in the failure to define. In our view, the definition does in fact narrow what is included in Louisiana's definition of gambling, excluding, by failing to include, activities which may in fact constitute gambling in other jurisdictions. The Legislature's definition excludes wagering on the outcome of sporting events and contests between or among animals and does not permit the placement of slot machines in establishments other than casinos. The Legislature's actions are fulfilling, not abdicatory. Gambling activities which are not normally conducted in casinos, whether land based or otherwise, have been regulated in accordance with the constitutional requirement.
Plaintiffs contend that the statutes are allegedly unconstitutional by virtue of the exemption of gaming establishments from taxation by the City of New Orleans. The power to tax is a facet of the plenary power of the state legislature, however, the City of New Orleans has taxation powers by virtue of its home rule charter. The Legislature, having delegated the power to tax to the city, has retained the power to withdraw or limit those powers by statute. Francis v. Morial, 455 So.2d 1168 (La.1984); See generally Daniel R. Mandelker et al., STATE AND LOCAL GOVERNMENT IN A FEDERAL SYSTEM Chapter 3 (1977). The city's taxation power has never been considered so autonomous that it could be exercised without limitation. See Circle Food Stores, Inc. v. The City of New Orleans, 620 So.2d 281 (La.1993) (city's Tobacco Products Special Tax held unconstitutional); Radiofone, Inc. v. The City of New Orleans, 616 So.2d 1243 (La. 1993) (Telecommunications Subscriber Charge held unconstitutional); Reed v. The City of New Orleans, 593 So.2d 368 (La.1992) (city's Tobacco Consumption Privilege Tax *1151 held unconstitutional); Scramuzza v. City of New Orleans, 507 So.2d 215 (La.1987) (city's Earnings Tax held unconstitutional).
Plaintiffs argue that the statutes preclude the City of New Orleans from acting in the area of land use, an area in which it is required to act under Art. VI, § 17 of the 1974 Constitution. It is a fundamental rule of statutory construction that use of the word "may" indicates a measure of discretion. La. Code Civ.Proc. art. 5053. Art. VI, § 17 uses the term "may" in pronouncing the authority of a political subdivision to adopt regulations for land use, zoning, etc. Clearly, no municipality is required to act in this area. It is interesting that plaintiffs raise the issue of abrogation of the city's taxing authority and its authority to regulate land use while the city itself has entered into a lease agreement with an entity desiring to operate the land based casino provided for by statute. Clearly, there has been no abrogation of the city's power to tax as this is a power to be delegated by and/or withdrawn by the Legislature. Likewise, the City of New Orleans may decline to exercise its discretionary authority to regulate land use, in connection with the establishment of a single casino.
Finally, plaintiffs argue that the statutes violate Art. VI, § 14(A) by requiring an increase in the City's expenditure of funds without obtaining the approval of the city through the enactment of an ordinance or resolution and/or without authorizing the city to levy and collect revenue to cover the increase expenditures. The operative word in Art. VI, § 14 is "requiring." Nothing in the statutes mandates that the city increase its expenditures, therefore there is no constitutional violation on this score. However, even if the statutes required increased expenditures, the City Council has voiced its approval of any increase in expenditures by virtue of entering into a lease agreement for a land based casino under the statutes as they now provide. This is clearly within "home-rule" perogatives.
The arguments presented by the parties were enlightening and the plaintiffs rendered a real service to the State and the City of New Orleans by insisting that a court of law weigh carefully and judiciously the actions of our Legislature. Having done so, we can all abide the principles annunciated hereinabove with constitutional approbation.
For the foregoing reasons, I join in the opinion stating additional compelling, concurring reasons.
NOTES
[*] Lemmon, J., not on the panel. For the procedure employed in assigning cases after January 1, 1993, to rotating panels of seven justices, see State v. Barras, 615 So.2d 285 (La.1993). Watson, J. was recused by the Court after the oral argument of this case in response to a Motion to Recuse filed on behalf of the Reily plaintiffs in these consolidated cases.
[1] Section 625(A) of the Casino Act, La.Rev.Stat. Ann. § 4:625(A) (West Supp.1993), provides that employees of the Casino Corporation "shall not be subject to civil service provisions."
[2] La. Const. art. V, § 5(D) provides that a case shall be appealable to the supreme court if a law or ordinance has been declared unconstitutional.
[3] At that time, the record in the Polk matter had not been lodged, briefs had not been filed in either case, and the case was not being given expedited treatment, all of which promised that its decision in the court of appeal would likely take more than a year.
[4] The powers of the federal government are derived from the powers relinquished by the states in the United States Constitution. Thus, the federal government has only those powers delegated to it by the Constitution. The states and their citizens retain all powers not delegated to the federal government or prohibited specifically to them. U.S. Const. amend. X. Thus, state constitutions typically contain limits on governmental authority rather than grants of power as with the federal constitution. Advisory Commission on Intergovernmental Relations, State Constitutions in the Federal System 8, 11 (1989).
[5] The term "general laws" is defined in La. Const. art. VI, which addresses Local Governments. While this definition is not harmful to the defendants' argument, it is nonetheless restricted to Article VI and not binding on a determination of whether a statute constitutes a local or special law pursuant to the Article III prohibition. Thus, the definition is merely illustrative for articles of the constitution other than Article VI. See generally, Lee Hargrave, The Louisiana State Constitution 53 (1991). This definition is as follows:

As used in this Article:
* * * * * *
(5) "General law" means a law of statewide concern enacted by the legislature which is uniformly applicable to all persons or to all political subdivisions in the state or which is uniformly applicable to all persons or to all political subdivisions within the same class.
La. Const. art. VI, § 44(5).
[6] See Labauve, 359 So.2d at 182.
[7] This principle is exemplified in New Orleans v. Treen, 431 So.2d 390 (La.1983). In Treen, this Court concluded that an act which, among other things, required the City of New Orleans to provide funding for the Audubon Park Commission, constituted "a local or special law" and was invalid for failure to comply with the publication requirement of La. Const. art. III, § 13. The court found that under the act only New Orleans was required to fund the park and that none of the surrounding parishes which derived substantial benefits from the park were required to provide any funds for the park. Additionally, the court recognized that the act permitted the state to take control of two pieces of property owned by the city. The court further explained that the park had been purchased and operated from its inception primarily with funds raised by the city. Moreover, the court found that the act had "an immediate and significant impact only on the people of New Orleans." Id. (emphasis in original). The present case stands in marked contrast to the Treen case. The challenged acts in the present case contain no local funding requirement. Nor do they permit the state to seize control of city owned property. Moreover, the challenged acts are designed to have a significant impact on the entire state.
[8] It is also worth noting, although not a dispositive consideration in our determination here, that regarding the local and special versus general law issue, at least one other state has found a law to be general simply if it affected the general revenues of the state. Dasch v. Jackson, 170 Md. 251, 183 A. 534 (1936); Gaither v. Jackson, 147 Md. 655, 128 A. 769 (1925).
[9] With the exception of the present constitution (since 1990) and the period from 1864 to 1895, lotteries have been prohibited by the Louisiana Constitution.
[10] La.Rev.Stat.Ann. § 4:627(A) (West Supp. 1993) provides in pertinent part that "[c]orporation operations are exempt from and no political subdivision may enact any measure ... to impose fees, or to tax corporation operations."
[11] Before the 1991 amendment, La. Const. art. VI, § 14 provided:

No law requiring increased expenditures for wages, hours, working conditions, pension and retirement benefits, vacation, or sick leave benefits of political subdivision employees, except a law providing for civil service, minimum wages, working conditions, and retirement benefits for firemen and municipal policemen, shall become effective until approved by ordinance enacted by the governing authority of the affected political subdivision or until the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount that such funds are provided. This Section shall not apply to a school board.
[12] In accordance with La.Rev.Stat.Ann. § 4:611(D) (West Supp.1993), "[t]he members of the board of directors and all employees of the corporation shall be considered public employees as defined by R.S. 42:1102(18) and the corporation shall be considered an agency as defined by R.S. 42:1102(2) for purposes of the ethics laws only."
[13] The legislature has deemed the development of a controlled gaming industry to be "important to the development of the economy of the state of Louisiana in that it will assist in the continuing growth of the tourism industry and thus will benefit the general welfare of our citizens." La. Rev.Stat.Ann. § 4:602(B)(1) (West Supp.1993).
[14] The statute creating the Board of Contractors contained no indication that the legislature intended the Board of Contractors to be other than a state board or agency. Noting that it was not within the constitutional province of the legislature to construe their own earlier enactments involved in litigation, the court did not consider the "Concurrent Resolution" of both houses of the 1958 Legislature which declared that it was not their intent in the creation of Act 233 of the 1956 Regular Session to establish the State Licensing Board for Contractors as an agency of the state or to place the Board under State Civil Service.
[1] The statutes prohibit the imposition of municipal taxes and instead impose state taxation, a characteristic which is also reflective of the general character of the statutes.