| iBLEICH, Justice,
dissenting.
This ease is not factually ripe for decision. A matter of this importance should be decided only after a full trial on the merits, not a scant hearing for a preliminary injunction. With the deepest respect to the majority and persuaded that the plaintiff possesses a compelling legal argument, I believe that the majority decides this matter too hastily. Without receiving evidence, the trial court has held, and the majority of this court has affirmed, that the LSA-R.S. 27:13 C(6) restriction on political contributions to political action committees[1] by gambling interests is an unconstitutional infringement of these persons’ First Amendment rights. The protection of First Amendment rights is of paramount importance. However, this decision should not be made without a complete record before this court. I would therefore remand this matter to the trial court for a full evidentiary hearing.
The First Amendment operates to protect both political expression and political association. Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 632-33, 46 L.Ed.2d 659 (1976). However, this constitutional interest may be impeded if the state has a sufficiently compelling countervailing interest, and the stricture is narrowly tailored to meet the concern. Id. at 25, 96 S.Ct. at 637-38; NAACP v. *1184 Alabama, 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958).
|2I would allow the State to introduce evidence to demonstrate that limiting the political influence of gambling interests in the State of Louisiana is a sufficiently compelling interest to justify this statutory ban. The State would also have to demonstrate that the statute at issue is narrowly tailored to accomplish its goals of preventing corruption and the appearance of impropriety in the gambling industry.
Gambling was legalized in this state only after earnest and sustained debate by the legislature.[2] Citizens voiced apprehensions concerning increased crime, poverty, and government corruption, and expressed fears regarding the adverse impact of legalized gambling upon families and communities. Gambling was finally approved only after assurances of stringent regulation of the industry by government. 'LSA-R.S. 27:2(A).
The State argues that the Act at issue serves the interest of preventing the large sums of money accessible to gambling interests from overwhelming the marketplace of ideas in their favor, to an extent that competing interests are unable to match. This statute would, according to the state, serve the interest not only of preventing gambling interests from attaining unwarranted political voice and clout, it would also help avoid the appearance of corruption in the industry. The State should be given the opportunity to present evidence to support these positions.
Given Louisiana’s history of corruption in the gambling industry,[3] and the problems *1185 already mounting in the industry, | .^particularly concerning video poker gambling, this issue is of |4prime concern as the legislature works to keep its promise to the people of controlling gambling and keeping it clean.
The only restriction drawn by the Act is the prevention of payments to Political Action Committees by owners of gaming establishments. However, the state has not been allowed to show that this is the least restrictive alternative via an evidentiary hearing. At such trial, the plaintiffs could also attempt to introduce evidence that the statute is too broadly drawn to effect only its limited purpose.
The theories and positions of the respective parties should be fully developed and then considered only after a full trial on the merits allowing all parties to presént any admissible evidence. Parenthetically, it is noted by counsel for Amici Curiae that “there is no evidence in the record supporting the State’s absolute ban on contributions aimed at promoting video poker .. ,”[4] The reason for this lack of evidence stems perhaps from the fact that the decision made by the lower court was in the context of a preliminary injunction and not a permanent injunction. Counsel for Southwest is correct in stating that this court is “never told how outlawing industry contributions to media PACs favoring retention of video poker will corrupt the democratic process.” Precisely this and the entire record compels a call for a complete presentation of evidence. What has led this court to this procedural and time-constraint posture is of no moment now.
This decision should not be made in a rush to judgment to answer questions simply because of an election. The issues involved before this court are far too important to be decided hastily.[5] Elections may come and go, referenda may be submitted, debated and decided. Important issues such as these before us involving free speech and the legitimate interests of the state | gshould be decided only after a full review of not just the law but also a complete record.
Being of the opinion that this case is premature for decision, and that all parties should be required to present their cases before the lower court, which record can then be reviewed, I have unsuccessfully argued to the majority that their decision today is premature.
I respectfully dissent.

. Not at issue this date is the question of the validity of contributions to candidates. Since that issue will probably be ultimately presented to this court, this writer finds it yet more imperative that a fully developed record be presented.

. This writer would also note that this debate has been perpetuated by this court's erroneous decision in Polk v. Edwards, 626 So.2d 1128 (La.1993). However, the validity of Polk is not before us today.

. This writer takes notice of a mere sampling of news articles and excerpts therefrom:
T.J. Simoneaux, "First Lottery in La. Led to National Ban — LSU Professor Examines Similarities, Differences," The Baton Rouge Advocate, Jan. 9, 1986, at 1A:
Gov. Edwin Edwards' proposal for a state lottery to ease Louisiana’s financial crunch naturally has resurrected memories of the state’s initial stab at a large-scale game of chance: the 1868-1893 Louisiana State Lottery Co.
That lottery — a corrupt enterprise approved by bribed legislators and run by two New York "carpetbaggers" — garnered millions for a few people, but almost nothing for Louisiana, whose severe economic problems then paralleled the state's situation today, an LSU history professor says.
The Louisiana State Lottery Co. continued to bribe legislators to keep its franchise and paid off state newspaper editors to ensure a good public image, Carleton says. But officials and newspapers in other state began to publicize allegations about the "Golden Octopus," as the lottery’s detractors called it in reference to the way it “stretched into every area of the nation," Robbins wrote in the Smithsonian. By 1879, anti-lottery forces here were strong enough to have the Legislature take away the company's charter.
T.J. Simoneaux, "Gambling is as Common as Crawfish to Louisiana," The Baton Rouge Advocate, Jan. 8, 1986, at 1A: As early as the colony's founding in 1699, Louisiana officials reported trouble in trying to stop games of chance. Gambling was legalized in 1823 and New Orleans soon had 14 casinos, which offered such games as faro, roulette and 21. However, pressure from religious and other community groups ended legalized gambling in 1836.
In Baton Rouge, the election of new officials spurred a parish grand jury investigation that resulted in widespread indictments in 1948 for violation of gambling laws.
Elizabeth Mullener, "The Once and Future Gambling Town,” New Orleans Times Picayune, June 14, 1992, at Al:
From the early 18th century, New Orleans has been a hotbed of gambling activity. Since the first settlers played games of chance in ale houses and taverns, the city has lived up to its reputation as an easy place to find trouble, tolerant of free spirits and free spending alike.
At times gambling has been legal; at times it has been illegal; at times it has been somewhere in between. Games are sometimes wide open and sometimes strictly underground. But always, through even the most stringent efforts at reform, gambling has endured.
And always it has attracted liberal doses of the vices that traditionally go along with it— prostitution, crime and most of all, corruption.
Marsha Shuler, "State’s Last Lottery Booted by 40-1 Margin,” The Baton Rouge Advocate, Jan. 9, 1986, at 7B:
The last time Louisiana voters had a lottery proposition on the ballot they voted it down by a 40-1 margin.
That was in March 1892 when voters shut down the now legendary Louisiana Lottery.
The U.S. Congress stepped into the picture, barring from the mails all letters, newspapers and circulars with information about the lottery.
*1185 The action came at the urging of President Benjamin Harrison who said: "The people of all states are debauched and defrauded ... by the Louisiana Lottery."
See also, Charles Hunt, "Riverboats and Racetracks — In 19th Century, Louisiana Had Games for All Tastes,” The Baton Rouge Sunday Advocate, Sept. 4, 1994, at 18 Magazine.

. Brief of Amici Curiae Southwest Louisiana Small Businesses for Video Gaming, et al., In Support of Appellee Charles A. Brown, p. 1.

. The referendum election date is Nov. 5, 1996.
Counsel for all parties have stressed an urgency for a speedy decision.