718 So.2d 1081 (1998)
Demetrius A. FAUL, Individually, and as Administrator and Natural Tutor of his minor child, Colbi Nicole Faul, and Michelle H. Faul, Plaintiff-Appellant,
v.
Andrew TRAHAN, et al., Defendant-Appellee.
No. 98-488.
Court of Appeal of Louisiana, Third Circuit.
October 7, 1998.
*1082 T. Robert Shelton, Thomas H. Morrow, Lafayette, for Plaintiff-Appellant Demitrius A. Faul, et al.
Leslie J. Schiff, Opelousas, for Defendant-Appellee Andrew Trahan, et al.
Before DOUCET, C.J., and GREMILLION and PICKETT, JJ.
DOUCET, Chief Judge.
The Appellants, Demetrius Faul, his wife and child, appeal the trial court's dismissal of their claims in this personal injury suit.
Faul alleges that he sustained injuries when a horse, Passem All, "flipped" onto him as he was about to begin exercising it. The matter was tried by a judge. After hearing the evidence, the trial judge rendered judgment in favor of the Defendants, finding in written reasons that:
1.) La.R.S. 9:2795.1, the Equine Immunity Statute, is constitutional and applies.
2.) Faul was an employee of Louisiana Stallions Inc., a division of Franks Farms, Inc. (Franks Farms).
3.) None of the Defendants was guilty of wilful or wanton negligence so as to establish liability under La.R.S. 9:2795.1. 4.) Faul was not injured as the result of an intentional tort which would constitute an exception to the exclusive remedy rule of the Louisiana Workers' Compensation statute.
The Plaintiffs appeal.

IS WORKERS' COMPENSATION FAUL'S EXCLUSIVE REMEDY?

1.) Was Faul an independent contractor?

Faul argues that the trial court erred in finding that he was an employee of Franks Farms. Faul asserts that he was an independent contractor, and thus excluded from the coverage of the workers' compensation law. We find no need to decide whether or not Faul is an independent contractor. Even if he is, he falls under the provisions of La.R.S. 23:1021(6), which states that:
As used in this Chapter, unless the context clearly indicates otherwise, the following terms shall be given the meaning ascribed to them in this Section:
....
(6) "Independent contractor" means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter.
The Louisiana Supreme Court in Lushute v. Diesi, 354 So.2d 179 (La.1977), found that under La.R.S. 23:1021(6), an independent contractor's exclusive remedy is nonetheless in workers' compensation where a substantial part of his work time is spent in manual labor carrying out his contract with the principal and the work he performs is part of the trade, business or occupation of the principal.
In this case, the evidence supports the conclusion that a substantial part of Faul's work time was spent in manual labor. Faul himself testified that he was hired to feed, water and groom horses. Briley also testified that these tasks constituted the majority of Faul's job. The evidence supports the *1083 conclusion that the work he performed is part of the trade, business or occupation of Frank Farms. Accordingly, even if Faul was an independent contractor, his remedy, in this case, is in workers' compensation.

2.) Has Faul shown that Franks Farms committed an intentional tort?

Faul further argues that even if he is found to be subject to the Louisiana Workers' Compensation Law, the acts or omissions of Franks Farms constitute an intentional tort, thus allowing him to claim tort damages pursuant to the intentional tort exception to the exclusive remedy rule of the Louisiana Workers' Compensation Statute.
The use of the intentional tort exception to the exclusive remedy rule of the workers' compensation law is well settled:
In White v. Monsanto Co., 585 So.2d 1205, 1208 (La.1991), the court set forth the law concerning "intentional acts" in the workers' compensation context, as follows:
LSA-R.S. 23:1032 makes worker's compensation an employee's exclusive remedy for a work-related injury caused by a coemployee, except for a suit based on an intentional act. The words "intentional act" mean the same as "intentional tort." The legislative aim was to make use of the well-established division between intentional torts and negligence in common law. The meaning of intent is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus, intent has reference to the consequences of an act rather than to the act itself. Only where the actor entertained a desire to bring about the consequences that followed or where the actor believed that the result was substantially certain to follow has an act been characterized as intentional. Bazley v. Tortorich, 397 So.2d 475 (La.1981).
We further note that the "substantially certain" language has reference to what a reasonable man in a defendant's position would believe. W. Prosser, Law of Torts, § 8 (4th ed. 1971).
Guarino v. Kaiser Aluminum & Chem, 97-926, p. 5 (La.App. 5 Cir. 5/13/98); 712 So.2d 989, 991. See also Callaway v. Anco Insulation, Inc., 98-0397 (La.App. 4 Cir. 3/25/98), 714 So.2d 730; Miller v. Couvillion, 96-136 (La.App. 3 Cir. 6/5/96); 676 So.2d 668; writ denied, 96-1781 (La. 10/11/96); 680 So.2d 641.
To recover against his employer under the intentional tort exception to the exclusive remedy rule of the Louisiana Workers' Compensation Statute, Faul had to show that Franks Farms, through its representatives, desired the physical result of its acts or omissions or that it knew that the result was substantially certain to follow. The trial court's determination in this regard is factual in nature and, therefore, should not be disturbed in the absence of manifest error. See Taylor v. Metropolitan Erection Co., 496 So.2d 1184 (La.App. 5 Cir.), writ denied, 497 So.2d 1388 (La.1986).
Lonnie Briley was the manager of the Opelousas location of Franks Farms. Faul argues that the trial testimony shows that Briley knew that Passem All was a dangerous horse and he should have warned potential riders about its tendencies. However, we find a substantial conflict in the testimony with regard to what Briley knew about the characteristics of Passem All, as well as with regard to other facts surrounding the accident.
Briley testified that the main business of the Opelousas facility is breeding and training its own horses. In addition, they rent stalls to parties needing to stable horses. The stalls were leased at a rate of $2.00 per day. The fee provided only stall rental and no additional services. Briley stated that his wife, who acted as office manger for the facility, took the stall rental. There were no formal requirements for stall rental until after Faul's accident. No investigation was made as to the qualifications of those renting stalls.
Briley further stated that in December 1992, Faul asked him if he needed any help on the farm. He offered to hire Faul to help with the upcoming Stallion Show. Faul began *1084 work on December 27, 1992, at a salary of $275.00 per week. Briley testified that he had Faul read the warning language required by the Equine Immunity Statute (La. R.S.9:2795.1) and told Faul that, while working for Franks Farms, he would not be allowed to ride outside horses during working hours. Briley testified that Faul's duties included feeding, grooming and watering six to eight horses, and cleaning their stalls.
Briley testified that Passem All was housed in a barn where stalls were leased to people who wanted to stable horses, but that he did not know when the horse first came to the facility. He had never seen the horse or spoken to anyone about it and that, prior to the accident, no one had told him that the horse was dangerous or crazy. He stated that after the accident Dennis Davis, another employee of Franks Farms, told him that Passem All would try to flip. He stated that Davis also told him that he and Faul had been riding horses belonging to third-parties during working hours. Briley testified that he found out about the accident when he made his rounds that day. He said that he saw Faul in one of the barns holding his hand on his back and asked what had happened. He stated that Faul said he had been helping a man out and the horse he was riding flipped. Briley testified that he again told Faul he should not have been riding outside horses. He stated that he offered to take Faul to the hospital but Faul said he wanted to see his own doctor. Briley testified that he asked another employee, Charlie Zenon, about the accident but that Zenon said he did not see it.
Davis also worked at Franks Farms. His deposition was introduced into evidence at trial. He testified that employees of Franks Farms were not supposed to ride horses other than those owned by Franks Farms during working hours. He confirmed that Briley had told him this many times. However, he admitted that he and the other employees were able to do so because Briley did not often go to the back barns containing the leased stalls. He further stated that he rode Passem All prior to Faul's accident and that the horse never flipped with him, although he had been told by a prior trainer of the horse that it would do so. Davis stated that he did not tell Briley or his wife anything about the horse. However, he testified that he told Faul and Zenon that the horse was a "flipper." He further stated that he had seen Faul ride the horse two or three times prior to the accident and warned Faul about the horse. He testified that he told Faul not to try to stop the horse because it would flip at such times, and to tighten the saddle in the barn rather than when in the saddle so as not to stop Passem All.
Andrew Trahan testified that he was training Passem All for its owner, Robert Jenkins. He stated that, at the time of the accident, he was not a licensed trainer, although he has since obtained his license. Trahan testified that he had a variety of people at the facility ride the horse for him, most often Davis but occasionally Demetrius Faul or Jason Faul, paying them five dollars a ride. He could not recall an occasion when Davis was on the horse and it reared up on him. However, he stated that the first time Davis got on the horse and tried to enter the starting gates, Passem All spun away from the gates and would not enter. He further testified that the horse always had trouble getting into the starting gates. He stated that he never told Briley anything about what his horses were doing and that he had no reason to. He stated that although he saw Briley go through the barn periodically, he did not show Briley his horses. He stated that Briley was never present when he had Passem All ridden. He did not tell Briley that the horse was dangerous or crazy. He testified that the horse was not crazy. However, he admitted that the horse had a problem going into the starting gates and stated that he told the jockeys this. He did not know whether Franks Farms' employees were allowed to work for others during working hours. He stated that he did not know if Faul was working for Franks Farms at the time of the accident.
Zenon testified that he never heard anyone say the horse was crazy. He stated that he did not actually see the accident. Connie Hudson, another employee of Franks Farms testified that, prior to Faul's accident, Briley told her that Passem All was crazy and a *1085 "flipper," i.e., a horse that will flip over to try to get a rider off its back. She further testified that Briley told her that Peter Mott had been hurt riding the horse. Both Hudson and Zenon denied having been told that they could not ride horses other than those belonging to their employer.
Mott was working as a jockey and exercising horses for others who kept horses at the facility. He testified that Briley had been watching when Passem All reared up and tried to throw him, causing him to jump off the horse. He further stated that, after that incident, he passed Briley and said, "That horse is crazy," and Briley replied, "He sure is." Briley denied ever speaking to Mott about the horse. Mott admitted he had never sat down and spoken to Briley but knew him only from seeing him at the stable.
Faul testified that Briley did not tell him not to ride horses not owned by Franks Farms during working hours. He further testified that Briley later told him that he knew Mott had been hurt on Passem All. He further stated that Hudson said Briley knew the horse was a flipper. However, he admitted that Briley was not there when the horse flipped anyone. He further denied that Davis had told him anything about the horse.
This is a case in which the conflicting testimony can only be resolved by an assessment of the witnesses' credibility. The trial court choose to believe that Briley's version of the situation. Where, as in this case, the evidence of record supports more than one competing view, a fact finder's choice cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Therefore, we find no error in the trial court's determination that Franks Farms through its representatives, desired the physical result of its acts or omissions or that it knew that the result was substantially certain to follow. Therefore, the trial judge correctly found that Faul's exclusive remedy against Franks Farms is in workers' compensation.

DOES LA.R.S. 9:2795.1 VIOLATE THE CONSTITUTIONAL GUARANTEE OF EQUAL PROTECTION?
Faul argues, as he did at trial, that La.R.S. 9:2795.1 violates the equal protection clause of the Louisiana and U.S. Constitutions.
La.R.S. 9:2795.1, the Equine Immunity Statute, provides tort immunity for "equine activity sponsors" and "equine professionals" as follows:
A. As used in this Section, the following terms shall have the following meanings, unless the context requires otherwise:
(1) "Engages in an equine activity" means riding, training, providing, or assisting in providing medical treatment of, driving, or being a passenger upon an equine, whether mounted or unmounted, or any person assisting a participant or show management. The term engages in an equine activity does not include being a spectator at an equine activity, except in cases where the spectator places himself in an unauthorized area and in immediate proximity to the equine activity.
(2) "Equine" means a horse, pony, mule, donkey, or hinny.
(3) "Equine activity" includes any or all of the following:
(a) An equine show, fair, competition, performance, or parade that involves any or all breeds of equine and any of the equine disciplines, including but not limited to any dressage, hunter and jumper horse show, grand prix jumping, three-day event, combined training, rodeo, driving, pulling, cutting, polo, steeplechasing, English and western performance riding, endurance trail riding, and western game and hunting.
(b) Equine training or teaching activities, or both.
(c) Boarding equine.
(d) Riding, inspecting, or evaluating an equine belonging to another, whether or not the owner has received some monetary consideration or other thing of value for the use of the equine or is permitting a prospective purchaser of the equine to ride, inspect, or evaluate the equine.
(e) A ride, trip, hunt, or other equine activity of any type however informal or impromptu that is sponsored by an equine activity sponsor.

*1086 (f) Placing or replacing horseshoes on an equine.
(g) Examining or administering medical treatment to an equine by a veterinarian.
(4) "Equine activity sponsor" means an individual, group, club, partnership, or corporation, whether or not the sponsor is operating for profit or nonprofit, which sponsors, organizes, or provides the facilities for an equine activity, including, but not limited to: a pony club; 4-H club; hunt club; riding club; school and college sponsored class, program, and activity; therapeutic riding program; and any operator, instructor, and promoter of an equine facility, including, but not limited to: a stable; clubhouse; ponyride string; fair; and arena at which the activity is held.
(5) "Equine professional" means a person engaged for compensation in any of the following:
(a) Instructing a participant or renting to a participant an equine for the purpose of riding, driving, or being a passenger upon the equine.
(b) Renting equipment or tack to a participant.
(c) Examining or administering medical treatment to an equine as a veterinarian.
(6) "Inherent risks of equine activities" means those dangers or conditions which are an integral part of equine activities, including, but not limited to:
(a) The propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around them.
(b) The unpredictability of an equine's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals.
(c) Certain hazards such as surface and subsurface conditions.
(d) Collisions with other equine or objects.
(e) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his ability.
(7) "Participant" means any person, whether amateur or professional, who engages in an equine activity, whether or not a fee is paid to participate in the equine activity.
B. Except as provided in Subsection C of this Section, an equine activity sponsor, an equine professional, or any other person, which shall include a corporation or partnership, shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities and, except as provided in Subsection C of this Section, no participant or participant's representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional, or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities.
C. Nothing in Subsection B of this Section shall prevent or limit the liability of an equine activity sponsor, an equine professional, or any other person if the equine activity sponsor, equine professional, or person either:
(1) Provided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and such equipment or tack was faulty to the extent that it did cause the injury.
(2) Failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity and to safely manage the particular equine based on the participant's representations of his ability.
(3) Owns, leases, rents, or otherwise is in lawful possession and control of the land or facility upon which the participant sustained injuries because of a dangerous latent condition which was known or should have been known to the equine activity sponsor, equine professional, or person and for which warning signs have not been conspicuously posted.
(4) Commits an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury.
(5) Intentionally injures the participant.

*1087 D. Nothing in Subsection B of this Section shall prevent or limit the liability of an equine activity sponsor or an equine professional under liability provisions as set forth in the "Louisiana Products Liability Act," R.S. 9:2800.51 through 2800.59.
E. Every equine professional and every equine activity sponsor shall post and maintain a sign conspicuously located which contains the warning notice specified in Subsection F of this Section. The sign shall be placed in a clearly visible location on or near any stable, corral, or arena where the equine professional or the equine activity sponsor conducts equine activities. The warning notice specified in Subsection F of this Section shall appear on the sign in black letters, with each letter to be a minimum of one inch in height. Every written contract entered into by an equine professional or by an equine activity sponsor for the provision of professional services, instruction, or the rental of equipment or tack or an equine to a participant, whether or not the contract involves equine activities on or off the location or site of the equine professional's or the equine activity sponsor's business, shall contain in clearly readable print the warning notice specified in Subsection F of this Section.
F. The signs and contracts described in Subsection E of this Section shall contain the following warning notice:
WARNING
Under Louisiana law, an equine activity sponsor or equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to R.S. 9:2795.1.
G. Failure to comply with the requirements concerning warning notices provided in this Section shall prevent an equine activity sponsor or equine professional from invoking the privilege of immunity provided by this Section.
The question of the constitutionality of this statute has not been considered by the courts.
Our jurisprudence mandates that all statutory enactments are presumed constitutional and every presumption of law and fact must be indulged in favor of legality. Moore v. RLCC Technologies, Inc., 95-2621 (La.2/28/96), 668 So.2d 1135; Polk v. Edwards, 626 So.2d 1128 (La.1993); See also, State ex. rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477 (1949).
Livingston Downs Racing Ass'n, Inc. v. State, 96-2890, p. 5 (La.12/2/97); 705 So.2d 149, 152.
In Soloco, Inc. v. Dupree, 97-1256 (La.1/21/98); 707 So.2d 12, the court discussed the application of the equal protection clause to La.R.S. 4:173.1, a statutory provision limiting liability for injuries caused by thoroughbred horses in the care of persons other than the owner. The court stated that:
LA.CONST. art. I, § 3 provides:
No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.
As noted by this Court in Manuel v. State, 95-2189 (La.7/2/96), 692 So.2d 320, LA. CONST. art. I, § 3 provides for three levels of constitutional review or scrutiny. Laws which classify individuals based on race or religious beliefs are repudiated completely. An intermediate level of scrutiny is reserved for laws which classify persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliation. The lowest level of scrutiny applies to laws which classify persons on any basis other than those enumerated in LA.CONST. art. I, § 3. Such laws need only be rationally related to a legitimate governmental purpose, and a person attacking the constitutionality of such a classification has the stringent burden of demonstrating that the law does not suitably further any appropriate state interest. *1088 See, Manuel, supra at 339; Moore v. RLCC Technologies, Inc. 95-2621 (La.2/28/96), 668 So.2d 1135; Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La. 1985).
Id. at p. 4; 15.
Because persons injured in the course of equine activities are not a classification based on one of the characteristics enumerated in La. Const. art. I § 3, the lowest level of scrutiny applies. The Plaintiffs, therefore, have the burden of showing that La.R.S. 9:2795.1 does not further an appropriate state interest. Id. The Fauls argue in brief that the law does not promote any legitimate state interest,0 in that "[i]t favors an extremely narrow class of individuals, primarily engaged in a commercial enterprise."
The trial judge, in his written reasons for judgment, opined that the statute did, in fact promote the legitimate state interest of promoting the horse industry, noting the numerous efforts on the part of the legislature to "give that industry a needed `boost.'" The court in Soloco, 97-1256, p. 5; 707 So.2d at 15, faced with another statute designed to promote the horse racing industry, stated that:
The horse racing industry is an important source of state revenue in addition to being a substantial employer of Louisiana residents. The owners of the thoroughbred horses used in racing are the lifeblood of the industry, in that they are the major source of the industry's capital.
Paraphrasing the language of the court in Soloco, we conclude that La.R.S. 9:2795.1 encourages the ownership of horses by limiting an owner's liability except in certain enumerated circumstances including injuries caused by "willful or wanton disregard for the safety of the participant" and intentional injuries. The liability of the equine activity sponsor is not altogether eliminated. Rather, the liability is limited to circumstances constituting "willful or wanton disregard for the safety of the participant" and intentional injuries. By removing a considerable risk of tort liability from the sponsor, La.R.S. 9:2795.1 encourages the participation of persons in supplying equine activities to the benefit of the industry as a whole. We find that La.R.S. 9:2795.1 is rationally related to the legitimate state interest of promoting equine related industry. Therefore, it does not violate the constitutional principal of equal protection.

HAS LIABILITY UNDER LA.R.S. 9:2795.1 BEEN PROVEN?
The defendant asserts that the trial court erred in not finding that he carried his burden of proving that his injury resulted from a willful and wanton act of an equine activity sponsor, that is Andrew Trahan or Robert Jenkins.
Only one case has thus far commented on the meaning of wanton and willful as used in the Equine Immunity Statute. In Gautreau v. Washington, 95-1731 (La.App. 1 Cir. 4/4/96); 672 So.2d 262, writ denied, 96-1164 (La.6/28/98); 675 So.2d 1123, the court explained that:
LSA-R.S. 9:2795.1C sets forth those exceptions in which the liability of an equine professional, equine activity sponsor, or any other person will not be limited. One of these exceptions is when the equine sponsor, equine professional or other person "commits an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury." LSA-R.S. 9:2795.1C(4). This court has defined "wanton" as follows:
that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence.... The usual meaning ... is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

Landry v. Uniroyal Chemical Company, Inc., 94-1274 p. 1 (La.App. 1st Cir.3/3/95), 653 So.2d 1199, 1205 (on application for rehearing), writ denied, 95-1381 (La.9/15/95), 660 So.2d 461.
Id. at p. 5; 266.
Therefore, to prove the liability of Jenkins and Trahan under the Equine Immunity *1089 Statute, Faul had to show that they acted with a reckless disregard for the consequences of their actions in the face of a known or obvious risk. The trial court's finding in these regards is factual in nature and will not be disturbed in the absence of manifest error. In addition to the testimony outlined above, the following testimony was adduced with regard to the conduct and knowledge of Trahan and Jenkins.
Trahan testified that he had been training horses since 1992. At that time he was not licensed but trained his own horses. In late 1992, his friend, Jenkins, acquired Passem All and he began training it along with his two horses. Neither the owner nor the previous trainer told him the horse had dangerous tendencies. The horses were stabled at the Franks Farms facility in Opelousas. He testified that Mott had been scheduled to ride the horse in a race at Delta Downs. Because he was not a licensed trainer at the time, he had Passem All run under the name of a licensed trainer, Wilbert McComb. He told McComb that the horse had "spun out" with Davis. He did not see the race but he was told that the horse tried to throw Mott as they were trying to put him in the starting gate. He stated that Mott never told him that the horse had flipped him. Trahan described the incident in which Faul was injured as follows: At about 10 a.m. on January 8, 1993, he asked Faul to ride the horse on the track located at Franks Farms. Knowing the horse had trouble with starting gates, he was leading the horse, with Faul on its back fifteen to twenty feet past the starting gates. Once past the gates, Faul was to gallop two or three times around the track. Faul asked him to stop so that he could tighten the girth on the horse. Passem All began to back up. Trahan dropped the lead when the horse began to pull on it. Faul had his feet in the stirrups and was pulling back on the reins while the horse backed up. The horse appeared to lose its composure and fell on top of Faul. The track was muddy and he felt that the horse had slipped rather than "flipped." It rolled over and ran into the barn area. Zenon, who was nearby, caught the horse and was hitting it in the mouth with the shank. Passem All fell into a ditch. Faul agreed to remount the horse and went back onto the track and tried to exercise him. Trahan opined that Faul pulled on the reins as the horse backed up and caused Passem All to roll over backwards. Trahan stated that he had never seen a horse behave like this and that this was the only horse he ever owned that did this.
Faul, on the other hand, testified that he did not have his feet in the stirrups and that the horse flipped over to get him off its back. He stated that it had all four feet off the ground. He stated that when it got up the horse flipped again before it ran off and that Zenon then grabbed the horse in an angry way and the horse flipped again.
It was Jenkins' undisputed testimony that he had no knowledge that the horse was dangerous or a "flipper."
Given the conflicts in the evidence adduced at trial, we find no error in the trial court's conclusion that neither Trahan nor Jenkins acted with a reckless disregard for the consequences of their actions in the face of a known or obvious risk. Therefore, the trial court correctly denied the Plaintiffs' claims against them.

CONCLUSION
For these reasons, the judgment of the trial court is affirmed. Costs of this appeal are to be paid by the appellants.
AFFIRMED.