Dear Mr. Decuir:
You have requested an opinion of the Attorney General relative to the legal requirements necessary for a valid cooperative endeavor agreement (Agreement), executed in accordance with Article VII, Section 14(C) of the Louisiana Constitution of 1974. At issue is the Agreement between Southern University (Southern), Grambling State University (Grambling), the Southern University System Foundation (Foundation) and the Grambling University National Alumni Association, Inc (Association). The Foundation and the Association are hereinafter collectively referred to as the "support organizations". Attached to your request is a copy of the Agreement.
Under the terms of the Agreement, the two universities and their support organizations agree to jointly engage in the promotion of activities which are ancillary to the Bayou Classic Southern/Grambling football game (Bayou Classic). These activities are official events associated with the Bayou Classic, including the Press Conference, Coaches' Luncheon, Friday Night Extravaganza, Miss Bayou Classic Pageant and Super Job Fair. The support organizations agree to be jointly responsible for all expenses associated with these events, same to be paid from revenues generated from the events and sponsorships.
The Agreement further provides that the support organizations obtain or license the national broadcast of the Bayou Classic football game, and be solely responsible for the costs and expenses associated therewith. The net proceeds from these ancillary events and the television broadcast are the property of, and deposited with, the support organizations, to be used for scholarships and the support of other activities of the universities.
In addition to the Agreement, itself, you have provided this office with the following factual information which we believe is relevant to the issue at hand.
The "Bayou Classic" is a name given to the annual football game played between Southern and Grambling State Universities. The football game is, and has been, the property of the two universities, each having signed a contract to play, annually, through 2001. The universities own and equally divide, all revenues from the game.
During the weekend of the Bayou Classic, there are other ancillary events, enumerated above. These events are sponsored and promoted by the support organizations in order to maximize the benefits and goodwill generated by the football game. The support organizations are also responsible for the expenses of televising the football game, assuming a liability of up to $1,000,000, to the extent advertising revenues fall short.
You further state that all expenses associated with the promotion and participation of the universities in these ancillary events are paid from event proceeds. Thus, no State money is expended by the universities. We turn now to the constitutionally and jurisprudentially imposed elements of a valid cooperative endeavor agreement.
The constitutional norm for the lawful use of public funds and property is found in Article VII, Section 14 which provides, in pertinent part, the following:
§ 14. Donation, Loan, or Pledge of Public Credit
 Section 14. (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property or things of value of the state or any political subdivision shall not be loaned, pledged or donated to or for any person, association, corporation, public or private.
 * * *
 (C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation or individual.
As can be gleaned from the above, Section 14(A) generally prohibits the loan, pledge or donation of public funds and property. Exceptions to this prohibition are found in Paragraph (B), all of which appear to be inapplicable to the issue before us.
Paragraph (C) of Section 14 authorizes the State and its political subdivisions to engage in cooperative endeavors for a public purpose with other governmental agencies, public or private corporations or individuals. However, Paragraph (C) supplements the prohibition against donations in Section 14(A). It does not create an exception or exemption from the general constitutional norm. The Louisiana Supreme Court has ruled that all cooperative endeavors authorized by Section 14(C) must also meet the general standard for the nongratuitous alienation of public funds or property established in Section 14(A). SeeCity of Port Allen v. Louisiana Risk Management, et al., 439 So.2d 399
(La. 1983).
Despite the authorization of cooperative endeavors, Section 14(A) is, nevertheless, violated whenever the State seeks to give up something of value in the absence of a legal obligation to do so. In other words, only if the transfer of public funds is required by a valid legal obligation will it be considered a constitutionally sanctioned cooperative endeavor.
The requirement of a legal obligation to expend or transfer public funds is the threshold, but not the only predicate for the constitutionality of the expenditure. The expenditure must also be for a public purpose and create a public benefit proportionate to its cost. A public purpose and benefit are presumed where the underlying legal obligation for the expenditure is created by the Constitution, a statute or an ordinance. Attorney General Opinion Nos. 01-40, 00-341, 99-387, 99-105, 92-722, 90-651 and 90-392. We turn now to the general powers and duties of the management boards of Southern and Grambling.
Article VIII, Section 7 of the Louisiana Constitution of 1974 provides, in pertinent part, for the creation and powers of the Board:
 Section 7. (A) Creation; Powers.
 The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College and the Board of Supervisors of Southern University and Agricultural and Mechanical College are created as bodies corporate. Subject to powers vested in this Article in the Board of Regents, each shall supervise and manage the institutions, statewide agricultural programs, and other programs administered through its system. (Emphasis added.)
Article VIII, Section 6 (A) provides the following with respect to the Board of Supervisors for the University of Louisiana System:
 Section 6. (A) Creations; Functions.
 The Board of Supervisors for the University of Louisiana System is created as a body corporate. Subject to powers vested by this Article in the Board of Regents, it shall have supervision and management of state colleges and universities not managed by a higher education board created by or under this Article.
R.S. 17:3217 further provides that the University of Louisiana System is comprised of the institutions under the supervision and management of the Board of Trustees for State Colleges and Universities. Among those institutions is Grambling.
The powers and duties of these two institutional management boards are set forth in R.S. 17:3351 which provides, in pertinent part, as follows:
 § 3351. General powers, and duties and functions of college and university boards
 A. Subject only to the powers of the Board of Regents specifically enumerated in Article VIII, Section 5 of the Constitution of Louisiana, and as otherwise provided by law, each postsecondary system management board as a body corporate shall have the authority to exercise power necessary to supervise and manage the institutions of postsecondary education under its control, including but not limited to the following:
 * * *
 (2) Actively seek and accept donations, bequests, or other forms of financial assistance for educational purposes from any public or private person or agency and to comply with rules and regulations governing grants from the federal government or any other person or agency which are not in contravention of the constitution and laws.
 * * *
 (16) Enter into contracts and agreements with other public agencies with respect to cooperative enterprises and undertakings relating to or associated with college or university purposes and programs, in accordance with applicable laws.
 (17) Perform such other functions as are necessary or incidental to the supervision and management of the university system it supervises and manages.
 * * *
 (B) In addition to the powers and duties vested by Subsection A of this Section and any other applicable laws, each board, as soon as practicable, shall adopt:
 * * *
 (2) Rules and regulations which may provide for:
 * * *
 (b)(i) The establishment, award, and continuance of fellowships, scholarships, and all other forms of student aid.
 * * *
 (d) It shall be the further duty of the board to employ the proceeds of all donations, grants, subscriptions and bequests to a university, or to any school, college or division, or in trust therefor, so as to effectuate the purposes and accord with the terms and conditions of such donations, grants, subscriptions and bequests.
We also direct your attention to R.S. 17:3390. It provides, in pertinent part, the following:
 § 3390. Private nonprofit corporations which support public higher education institutions; findings; status; private funds
 A. The legislature finds that private support enhances the programs, facilities, and research and educational opportunities offered by public institutions of higher education in Louisiana. Therefore, each higher education management board and institution is hereby encouraged to promote the activities of alumni associations, foundations, and other private, nonprofit organizations that raise private funds for the support of public institutions of higher education. Further, it is recognized that private, nonprofit organizations under the direction and control of private individuals who support institutions of higher education are effective in obtaining private support for these institutions.
 B. A nonprofit corporation, whose principal purpose is to support one or more programs, facilities, or research or educational opportunities offered by public institutions of higher education shall be a private entity that shall not be deemed to be a public or quasipublic corporation or an administrative unit public servant, employee, or agent of any institution of higher education for any purpose whatsoever if it meets all of the following criteria:
 * * *
 (3) The corporation reimburses, either directly or through in-kind services, the cost of housing, personnel, which personnel shall remain public servants for all purposes, and other support furnished to the corporation by any institution of higher education.
 C. The receipt, investment, or expenditure of public funds shall not affect the private status of any corporation meeting the criteria set forth in Subsection B of this Section; however, books and records of any such corporation, to the extent that such books and records directly pertain to the receipt, investment, or expenditure of public funds, shall be subject to R.S. 44:1 et seq. No other books and records of any such corporation shall be subject to R.S. 44:1 et seq.
 D. Alumni associations, alumni foundations, and other private, nonprofit alumni organizations that raise private funds for the support of public institutions of higher education shall have a financial accounting system established pursuant to customary and current accepted accounting standards. The financial affairs of the organizations shall be audited annually in accordance with generally accepted auditing standards by an independent professional auditor who shall furnish to the legislative auditor copies of his annual audit. (Emphasis added.)
As can be seen from the above, R.S. 17:3390 sets forth legislative findings regarding the purpose and status of support organizations vis-a-vis their respective universities. Therein, the Legislature has expressly recognized the educational benefits derived from private support generated by support organizations on behalf of their universities. In doing so, the Legislature encourages universities to promote the activities of such organizations. We believe that, by enacting this legislation, the Legislature deems the relationship between Southern and Grambling and their respective support organizations, and the enhancements afforded thereby, to be in furtherance of a public purpose from which a public benefit is derived.
Clearly envisioned within Section 3390 is the authority to contract among the universities and their respective support organizations for the promotion of those events ancillary to the Bayou Classic — one of the most prestigious cultural and sporting events organized and promoted by African-Americans in the nation. Not only is it a dynamic recruitment tool for the universities, but it generates funds for scholarships and other related university activities.
Accordingly, it is our opinion that the Agreement has been confected pursuant to constitutional and statutory authorities, thereby satisfying the requirement that it is based on a legal obligation. We further opine that the benefits and purposes to be derived from the Agreement are public in nature. In accord is Attorney General Opinion Nos. 01-40 and 99-105.
With regard to the last criterion that the public benefit created be reasonably commensurate to its costs, we rely upon your assurances that all expenses from the ancillary events are paid from the proceeds thereof, and that no State monies are expended by the universities for their participation. Based on these assurances, it is the opinion of this office that any obligations assumed by the universities under the Agreement are not so disproportionate to the benefits to be realized so as to render the Agreement unconstitutional.
In reviewing the Agreement, we were unable to find any provision alluding to the fact that the public benefit is proportionate to the obligations undertaken by the universities. We recommend that appropriate language be inserted to reflect this requirement.
Please be advised that this opinion is limited in scope to the legal issues relating to the validity of the Agreement. It does not address the specific expenditures made by the support organizations in connection with the events ancillary to the Bayou Classic. Nor does it address the issue of whether the universities or the support organizations should be responsible for these events. We believe this to be an administrative decision, lying within the sound discretion of the universities and their management boards.
Finally, we are enclosing a copy of Opinion No. 01-40 for your reference and convenience. It presents an analysis of the interrelationships between colleges and universities and their support organizations, pursuant to R.S. 17:3390.
Trusting this adequately responds to your inquiries, I am
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 By: ____________________________ ROBERT E. HARROUN, III Assistant Attorney General
RPI/REH,3/sfj
OPINION NUMBER 01-40
March 16, 2001
13-A Corporations 22-B Education Colleges and Other Institutions of Higher Learning 90-A-2 Public Funds-Loan, Pledge or Grants
Article VII, Section 14 of the 1974 Louisiana Constitution
R.S. 17:3390, 25:1, 33:1236(11)(A)(e), 33:4553, 44:1 and 56:366(B) and 279(B)
Discussion of the circumstances under which a university can loan or advance public funds or services to a university foundation, alumni association or not-profit corporation.
Mr. Daniel G. Kyle, CPA, CFE Legislative Auditor 1600 North Third Street Post Office Box 94397 Baton Rouge, LA 70804-9397
Dear Dr. Kyle:
You have requested an opinion of the Attorney General, in your capacity as Secretary of the Legislative Audit Advisory Council (Council), relating to fiscal transactions between the universities of our State and their respective associated foundations, alumni associations and not-for-profit corporations (hereinafter collectively referred to as "support organizations").
You state that, in the course of your audits of universities, you have reviewed university financials which reflect receivables or "loans" by universities to these support organizations. You specifically ask for a general overview of the law, including Article VII, Section 14 of the Louisiana Constitution of 1974, to determine if it is permissible, with or without a cooperative endeavor agreement, for a university to advance funds, even for short intervals, to or on behalf of their support organizations.
Your request must be examined in light of Article VII, Section 14, R.S.17:3390 and the case of Guste v. Nicholls College Foundation, 564 So.2d 682
(La. 1990). Article VII, Section 14 provides, in pertinent part, the following:
 § 14. Donation, Loan, or Pledge of Public Credit
 Section 14. (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property or things of value of the state or any political subdivision shall not be loaned, pledged or donated to or for any person, association, corporation, public or private. . . .
 * * *
 (C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation or individual. (Emphasis added.)
We have consistently cited Article VII, Section 14 as the constitutional norm for the lawful use of public funds and property. Section 14(A) generally prohibits the loan, pledge or donation of public funds and property. Exceptions to this prohibition are found in Paragraph (B), all of which appear to be inapplicable to the issue before us.
Paragraph (C) of Section 14 authorizes the State and its political subdivisions to engage in cooperative endeavors for a public purpose with other governmental agencies, public or private corporations or individuals. However, Paragraph (C) supplements the prohibition against donations in Section 14(A). It does not create an exception or exemption from the general constitutional norm. The Louisiana Supreme Court has ruled that all cooperative endeavors authorized by Section 14(C) must also meet the general standard for the nongratuitous alienation of public funds or property established in Section 14(A). SeeCity of Port Allen v. Louisiana Risk Management, et al., 439 So.2d 399
(La. 1983).
Despite the authorization of cooperative endeavors, Section 14(A) is, nevertheless, violated whenever the State seeks to give up something of value in the absence of a legal obligation to do so. In other words, only if the transfer of public funds is required by a valid legal obligation will it be considered a constitutionally sanctioned cooperative endeavor.
The requirement of a legal obligation to expend or transfer public funds is the threshold, but not the only predicate for the constitutionality of the expenditure. The expenditure must also be for a public purpose and create a public benefit proportionate to its cost. A public purpose and benefit are presumed where the underlying legal obligation for the expenditure is created by the Constitution, a statute or an ordinance. Attorney General Opinion Nos. 00-341, 99-387, 92-722, 90-651 and 90-392.
Based on the above, we believe a purely gratuitous loan with no obligation or responsibility on the part of the support group to perform any function in return would violate Article VII, Section 14(A). However, we have been advised by representatives of your office that, for purposes of your request, the term "loan" must be considered within the context of R.S. 17:3390. It provides, in pertinent part, the following:
 § 3390. Private nonprofit corporations which support public higher education institutions; findings; status; private funds
 A. The legislature finds that private support enhances the programs, facilities, and research and educational opportunities offered by public institutions of higher education in Louisiana. Therefore, each higher education management board and institution is hereby encouraged to promote the activities of alumni associations, foundations, and other private, nonprofit organizations that raise private funds for the support of public institutions of higher education. Further, it is recognized that private, nonprofit organizations under the direction and control of private individuals who support institutions of higher education are effective in obtaining private support for these institutions.
 B. A nonprofit corporation, whose principal purpose is to support one or more programs, facilities, or research or educational opportunities offered by public institutions of higher education shall be a private entity that shall not be deemed to be a public or quasipublic corporation or an administrative unit public servant, employee, or agent of any institution of higher education for any purpose whatsoever if it meets all of the following criteria:
 * * *
 (3) The corporation reimburses, either directly or through in-kind services, the cost of housing, personnel, which personnel shall remain public servants for all purposes, and other support furnished to the corporation by any institution of higher education.
 C. The receipt, investment, or expenditure of public funds shall not affect the private status of any corporation meeting the criteria set forth in Subsection B of this Section; however, books and records of any such corporation, to the extent that such books and records directly pertain to the receipt, investment, or expenditure of public funds, shall be subject to R.S. 44:1 et seq. No other books and records of any such corporation shall be subject to R.S. 44:1
et seq.
 D. Alumni associations, alumni foundations, and other private, nonprofit alumni organizations that raise private funds for the support of public institutions of higher education shall have a financial accounting system established pursuant to customary and current accepted accounting standards. The financial affairs of the organizations shall be audited annually in accordance with generally accepted auditing standards by an independent professional auditor who shall furnish to the legislative auditor copies of his annual audit. (Emphasis added.)
As can be gleaned from the above, R.S. 17:3390 sets forth legislative findings regarding the purpose and status of support organizations. Therein, the Legislature has expressly recognized the educational benefits derived from private support generated by support organizations on behalf of their universities. In doing so, the Legislature encourages universities to promote the activities of such organizations. We believe that, by enacting this legislation, the Legislature deems the relationship between the universities and their respective support organizations, and the accomplishments afforded thereby, to be in furtherance of a public purpose from which a public benefit is derived.
The "loans" to which you refer in your request typically arise out of situations envisioned in Section 3390(B)(3). For example, the university will provide office space and/or university personnel to house and staff the support organization. The university then pays the rent and/or employees' salaries and sets up a corresponding receivable on its financials. You question the validity of these transactions. In the event they are not constitutionally prohibited, you ask, at what point in time should the university be reimbursed by the support organization.
In addition to Article VII, Section 14 and R.S. 17:3390, the issue of the legitimacy of these transactions must be examined in light of Guste v.Nicoholls, cited supra. In connection with an investigation conducted at Nicholls State University (Nicholls), the Office of the Inspector General (OIG) sought to examine the financial records of the Nicholls College Foundation (Foundation), a nonprofit corporation. The OIG believed that the Foundation had received public funds through a donation from the Nicholls State University Alumni Federation (Federation). The Federation is also a nonprofit corporation. Each semester, Nicholls collected a mandatory self assessment fee (Fee) from its student body, designated for use by the Federation. The money was deposited, along with other fees and tuition, in Nicholls' general operating account, and subsequently transferred to the Federation in one lump sum payment after registration was completed.
In 1984 the Board of Directors of the Federation decided to give the Foundation ten percent of all Fees received by the Federation from Nicholls. The OIG inspected the Federation's records without opposition, but the Foundation refused to allow an inspection of its records. The Attorney General filed suit on behalf of the OIG to obtain a court order allowing the examination of the Foundation's records pursuant to the Public Records Act (Act). This office contended that the Foundation's records were subject to examination because it is a "public body" under the definitional terms of the Act or, alternatively, because it received money paid under the authority of the Constitution and laws of the State. In other words, the funds received were public funds paid by a public body (Federation) to a private nonprofit corporation (Foundation).
The Foundation contended that the money it received from the Federation did not constitute public funds, but was rather a simple donation without responsibility on the part of the Foundation to perform any function in return.
The Court approached the resolution of the case by considering answers to the following preliminary questions:
 (1) Was the Foundation a public body?
 (2) Was the Federation a public body?
 (3) Were the Fees transferred by the Federation and received by the Foundation public funds?
 (4) Were the Fees transferred by the Federation in furtherance of a constitutional or legal duty?
 (5) Correspondingly, was the Foundation, if not a public body, nevertheless charged, upon receipt of the Fees, to use same in furtherance of a constitutional or legally endowed responsibility?
While the Court found there to be insufficient evidence in the record to determine whether the Foundation constituted a public body, it noted that the issue could be resolved without making that determination. The Court found that the Federation, because of its close relationship with Nicholls, constituted a quasi-public nonprofit organization, designated as an entity to perform a governmental or proprietary function. In making this determination, the Court referenced the Federation's Articles of Incorporation which declared as its stated purpose to "foster, protect, and promote the welfare of Nicholls State University".
The Court further found that the Fees constituted public funds, citingCarter v. French, 322 So.2d 305 (La.App. 1st Cir. 1975) writ denied. Thus, the recipients of those funds, whether they be governmental, public or private bodies, were subject to the Act insofar as their financial records are concerned.
The Court next determined that the Federation was formed to further the educational goals of Nicholls. The educational goals of the Federation constituted a charge under its charter and coincided with the legal and constitutional duties of the Nicholls. Hence, it performed a governmental or proprietary function.
The Court further reasoned that the transfer of the public funds by the Federation to the Foundation was given and accepted under the authority of the Constitution and laws of this State. In other words, the funds were transferred in the discharge of the Federation's constitutional or legal duties, and were accepted by the Foundation with a commitment to assist the Federation in carrying out those constitutional and legal duties related to public education.
In addressing the issue of whether the transfer violated the Constitution, the Court stated:
 The Federation has seen fit to transfer a portion of the student fees to the Foundation. The Louisiana Constitution, however, prohibits donations by the state to "any person, association, or corporation, public or private", La Const. art. 7, § 14(A). Because the central purpose of both organizations is to promote the University, it can be presumed that the transfer was in furtherance of the respective groups' purposes and not an impermissible donation of public funds. We can, therefore, assume that the transmission from the Federation to the Foundation was in furtherance of the Federation's discharging its constitutional or legal duties of furthering public education; i.e., it must have been given by the Federation in pursuit of the Federation's legally endowed goals.
 . . . The Foundation has undertaken, as its purpose, assistance to the University, its faculty and its students, by promoting public education, a purpose that coincides with the University's and the Federation's constitutional and legal duties. The transaction between the Federation and the Foundation constitutes a transfer of public funds [rather than simply a donation, which is prohibited by La. Const. art. 7, § 14(A)] Because the objectives of the Federation, the Foundation and the University coincide in the furtherance of a governmental purpose, and because a simple donation would be illegal we find that the money was given and accepted "under authority of the constitution and the laws of this state" in furtherance of a governmental purpose. (Emphasis added.)
As can be gleaned from the above, the Court determined this transfer of public funds to be legally permissible. It also held that the Foundation's records pertaining only to the receipt and expenditure of those funds were subject to inspection under the Act.
We have applied the elements necessary for a valid cooperative endeavor agreement and the pronouncements of the Court in Nicholls on numerous occasions. Attorney General Opinion No. 92-807 addressed the issue of whether a nonprofit, privately-held and operated drug rehabilitation center, located within a parish, could be funded with parish general revenues. R.S. 33:1236(11)(A)(e) authorizes parish governing authorities to fund health service programs for parish indigents. The purpose of the rehabilitation center was to educate and rehabilitate drug and alcohol abusers living within the parish. We concluded that the parish could establish its own program for the treatment of its indigent substance abusers or, alternatively, pursue those goals by entering into a cooperative endeavor agreement with the rehabilitation center. However, parish funding could only be expended for the treatment of indigents.
In Opinion No. 93-622, we reviewed the legality of a contract between the Department of Wildlife and Fisheries and a private organization, under which public monies of the Louisiana Fur and Alligator Advisory Council (Council) would be used to fund contracts for the development and coordination of a national organization or trade association concerned with American Alligators. R.S. 56:366(B) and 279(B) establish the goals of the Council. Council funds could be used solely for the promotion of those goals which include "strengthening existing markets and developing new market and marketing strategies to enhance the commercial alligator industry". We examined the goals of the organization and, citingNicholls, we opined that Council funds could be used for the development of the association.
In Opinion No. 94-629, we concluded, citing Nicholls, that a parish could transfer or loan public funds to a drainage district, if the loan was pursuant to a cooperative endeavor agreement. Under the agreement, whereby the district agreed to perform, on behalf of the parish, legal or statutory obligations or functions that would otherwise have to be performed by the parish.
In Opinion No. 95-46, we addressed the issue of whether a city could take possession of 2,744 square feet of office space to be used as a federal food community distribution center and administrative offices for a nonprofit community action agency. Under a proposed cooperative endeavor agreement, the city would finance services to the office, including electricity, water, gas, pest control, grounds maintenance, trash collection and fire protection, and the community action agency would administer the distribution of federal food commodities to the city's indigent residents. We noted that a municipal corporation, under its police power, could provide for the support of the poor and necessitous within its jurisdiction, including participation in a federal program for the distribution of surplus federal food. Citing Nicholls, we concluded that the city could do so by establishing its own program, or by entering into a cooperative endeavor agreement with the nonprofit corporation.
In Opinion No. 96-291, we examined a request from a village to enter into a cooperative endeavor agreement with a nonprofit recreation association to refurbish a school gymnasium and grounds into a community center to be used by the resident youth living in low to moderate income families. Under the terms of the agreement, the village would assist in the cost of the repairs, maintenance and utilities as funds were made available therefor. R.S. 33:4553 vests the village with broad and sweeping authority to develop and administer recreational programs and facilities. The Articles of Incorporation of the recreational association state its purpose to be for the promotion of education, culture and recreation for the citizens of the village. Citing Nicholls, we concluded that the village could establish its own recreational program or, alternatively, enter into a cooperative endeavor agreement with the nonprofit association to administer the program.
Opinion 96-534 addressed the issue of whether the Louisiana Library Foundation could legally receive royalties from the sale of a reference book listing song titles held in the State Library collections. These monies would be deposited into the Foundation's account and used to benefit the State Library's goals and objectives. Among the objects and purposes enumerated in the Articles of Incorporation of the nonprofit foundation was that of assisting the State Library in providing funds for books and materials, equipment, printing, publicity, programs, activities and services in keeping with its mission and purpose. We determined that these objects and purposes paralleled and reinforced the purposes and goals of the State Library as mandated by R.S. 25:1, et seq. Accordingly, we held that the foundation could receive the proceeds from the sale of the book in accordance with a royalty contract, as long as the funds were expended in accordance with the objects and goals enumerated in the foundation's Articles of Incorporation.
Based on the above analyses of Article VII, Section 14, R.S. 17:3390 andGuste v. Nicohlls, it would appear that it is legally permissible for our universities to enter into those transactions contemplated in Section 3390(B)(3) with their support organizations under the following conditions:
 (1) The goals and objectives of the support organization, as evidenced by its charter and/or Articles of Incorporation, are consistent with those of the university (i.e., to carry out a governmental or proprietary function);
 (2) The funds so transferred are expended in accordance with these goals and objectives; and
 (3) The funds provided by the university are not appropriated, dedicated, or restricted to use for another purpose.
To exclude such transactions would, in effect, challenge the constitutionality of Section 3390, and the legislative findings contained therein. In this regard we must be guided by the general rule that all statutes are presumed to be constitutional. In Polk v. Edwards,626 So.2d 1128 (La. 1993), the Court held:
 An elementary principle statutory construction in constitutional law holds that all statutory enactments are presumed to be constitutional. Interstate Oil Pipe Line v. Guilbeau, 217 La. 160, 46 So.2d 113
(1950); State on behalf of J.A.V., 558 So.2d 214 (La. 1990). Unless the fundamental rights or privileges or immunities of a person are involved, a strong presumption exists that the legislature, in adopting legislation, has acted within its constitutional authority. Board of Directors of Louisiana Recovery Dist. v. All Taxpayers, Property Owners, etc., 529 So.2d 384 (La. 1988). This presumption is especially forceful in the case of statutes enacted to promote a public purpose. Id. at 387; See United States v. Jacobs, 306 U.S. 363, 369-70, 59 S.Ct. 551, 83 L.Ed. 763, 768 (1939). . . .
We are unaware of any jurisprudence declaring Section 3390 to be unconstitutional. Accordingly, the constitutionality of this statute must be presumed, as applied in this opinion, absent jurisprudence to the contrary.
We further opine that any such transaction should be effected pursuant to a formal cooperative endeavor agreement that clearly reflects: (1) the reciprocal rights and duties of each party; (2) the nature and description of the public benefit to be derived therefrom; and (3) that the public benefit is proportionate to the expenditure made by the university.
We turn now to the issue of the timing of the direct and/or in-kind reimbursement. For reasons unknown, the Legislature did not provide for a specific period of time within which the reimbursement must be made. Perhaps the omission was intentional to allow some flexibility, depending upon the nature of the transaction and the public purpose or governmental function it was designed to further.
We are of the opinion that reimbursement should be within a reasonable period of time, taking into consideration the nature of the transaction, whether the reimbursement is direct or in-kind and sound business practices. In this regard, we direct your attention to R.S. 39:1410.60. Paragraph (A) generally requires that political subdivisions, public corporations, etc., obtain State Bond Commission approval to borrow money, incur debt or issue bonds. However, Section 39:1410.60(B)(1) provides:
 B. (1) The provisions of this Section shall not apply to purchases made in the ordinary course of administration on terms of credit not to exceed ninety days.
We believe a ninety day window for reimbursement to be reasonable,unless the nature of the transaction and/or method of reimbursement renders same impossible. In any event, care should be taken that the reimbursement be made as required by Section 3390, or the transaction could be deemed unconstitutional. We further believe the terms of the reimbursement should be clearly set forth in the cooperative endeavor agreement.
In addition, the books and accounts of the university should clearly reflect the transaction in a manner acceptable and appropriate for audit purposes. Finally, the support organization should reflect the transaction in its financial records in accordance with R.S. 17:3390(D).
Trusting this adequately responds to your inquiry, I am
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 By: ___________________________ ROBERT E. HARROUN, III Assistant Attorney General
RPI/REH,3/sfj